## FREDERICK R. HUNT v. LEONARD T. SMITH, et al.

1. TAKING LANDS FOR RAILROAD PURPOSES; *Legality of Laws.* The statutes of Kansas authorizing real estate to be appropriated to the use of a railroad company for a right of way, so far as they apply to this case, do not contravene the provisions of § 4, article 12 of the constitution, and are not unconstitutional or void.

2. "OCCUPANT;" *Notice.* An owner of land is not in the actual occupancy of the same, within the meaning of § 49 of the act concerning private corporations, unless he is an actual resident thereon; and where such owner is not an actual occupant of the land, notice of an appropriation of a part of the same for a right of way for a railway given by publication in a newspaper, as provided by amended § 86 of said act (laws of 1870, ch. 74, § 1,) is sufficient.

3. MAP AND PROFILE OF ROAD—*Filed by Company.* It is not necessary under § 48 of the act concerning private corporations, that a railroad company should file with the county clerk a map and profile of the entire line of their proposed road through the county before they can apply under amended § 87 of said act (laws of 1870, ch. 74, § 2,) to have commissioners appointed to make an appraisement and assessment of damages to any part of the property along the line of said road. A map and profile of what the company desires to have appraised, etc., is sufficient.

4. APPRAISAL; *Value; Damages; Benefits.* Such commissioners must appraise the value of the land appropriated, and assess the damages to that not appropriated, irrespective of any suposed benefit to that not appropriated.

5. REPORT OF COMMISSIONERS; *Description of Land.* It is not necessary that the report of the commissioners should show upon its face more specifically what portion of any particular tract of land was appropriated, or appraised, or for the taking of which damages were assessed, than to show that the land appropriated was a strip through a certain quarter-section of land (describing particularly the quarter-section,) one hundred feet wide, along the line proposed by the railroad company; for such strip cannot vary from that shown by the map and profile of the company filed in the county clerk's office, and such map and profile make it definite and certain what land is appropriated.

6. ———— It is not necessary, where only a strip of land one hundred feet wide is taken, that the report should show expressly that the commissioners deemed such strip necessary.

7. ———— Where the commissioners in their report use numerals only to express the valuation of the land taken, and the damages to that not taken, and where it is evident from the report that the commissioners intended that such numerals should represent dollars and cents, the report is not void because the commissioners omitted to use either the dollar-mark, or the words "dollars" and "cents," or some abbreviation of the same.

8. ———— Nor is the report void because it does not show that any crops, buildings or improvements were valued, or damages thereto assessed, or that there were no such crops, buildings or improvements on the land to be taken, or damaged by the appropriation of the right of way.

9. ———— Nor is the report void because it simply shows that the commissioners valued the land taken, and assessed the damages to that not taken, and does not show affirmatively that they did not deduct from the said value or damages anything for benefits to the land not taken.

*Error from Leavenworth District Court.*

THE charter of the Kansas Central Railway Company was filed in the office of the Secretary of State June 1st, 1871. The corporators were Leonard T. Smith, James C. Stone, Lucien Scott, H. L. Newman, and M. S. Hall; and the object and purpose of the corporation was to construct and operate a railway from the city of Leavenworth westerly, to the western boundary of the State—to do which would require a right of way from said city, westwardly, through the county of Leavenworth. October 3d, 1871, the company made application to the Judge of the Leavenworth district court (ch. 74, §§ 1, 2, Laws of 1870,) for the appointment of commissioners to perform the services required of county commissioners, and such

commissioners were appointed, and subsequently made and filed their report in the office of the county clerk. The line of the proposed route was through a quarter-section of land belonging to *Hunt*, plaintiff in error. On the 13th of November 1871 *Hunt* commenced his action in the district court to enjoin *Smith* and the other corporators from appropriating a right of way 100 feet in width through his land for the use of said railway company until they should, in the manner provided by law, have acquired a right so to do, and to recover damages for certain trespasses by said defendants, their agents, servants, etc., committed on said land in and about the matter of attempting to make such appropriation without a right so to do, etc. The district judge granted a temporary restraining order as prayed for in plaintiff's petition, to operate until further order; and on the 20th of that month, having heard and considered the application for the injunction refused to grant the same, and dissolved the restraining order theretofore made. The grounds upon which the plaintiff sought the injunction, and the reasons given for refusing to grant it, will appear from the decision of the district judge, quoted in full in the opinion of the court. From this order of the district judge denying his application for an injunction *Hunt* appeals, and brings the case here on error for review.

*Clough & Wheat*, for plaintiff in error:

1. Defendant's charter shows that the company intended to construct its road through Leavenworth county, westwardly from the city, and that such intention existed when the first map and profile were filed. Sec. 48, ch. 23, Gen. Stat., required the company to make and file in the office of the county clerk a map and profile of the route it intended to adopt in said county; and from §§ 81 and 82 we think it clear that such map and profile should have been of the *entire route* through the county; and this was not done. Said map and profile only extended a part of the way through the county. The application to the judge for the appointment

of commissioners should have shown that the map and profile of the route, entirely through the county, had been filed by the company.

2. The report made by the commissioners does not show or state that they had ascertained or deemed it *necessary* to take so much land of plaintiff as was attempted to be appropriated. This was necessary. Gen. Stat., ch. 23, §§ 81, 82.

3. There is nothing in the report, as we read it, to show what the *value* was of the seven and 63.100 acres pretended to be appraised, or what the amount of any damage was— there being nothing to show that either column in said report meant either dollars or cents. 1 Wallace, 398; 31 Cal., 132; 30 Cal., 611; 21 Ill., 147; 20 Ill., 340. Sec. 86 of said ch. 23, (amended by § 1, ch. 74, laws of 1870,) requires the commissioners to specify the "*value* of the land," etc.

Nor is there anything in said report to show or indicate that the value of any crops, buildings or improvements was taken into consideration by the commissioners; but on the contrary, if they made any estimate of value at all it is, we think, clear from the report that it was only of the land itself, which is mentioned as only one of the things, the value of which should have been determined by the commissioners. See the statement in said § 1, in relation to "land, crops, buildings, and other improvements."

4. And if by said report the commissioners assessed any damages, then we submit that the damages by them assessed were not *the* damages, and do not appear to be the damages *irrespective* of benefits, as required by § 4 of article 12 of the constitution. Said § 82 attempts to permit benefits to be considered by the commissioners, and is therefore *void*, because in conflict with said § 4; and if we are right in this matter of conflict, it follows of course that the whole statute law in relation to the appropriation of rights of way for railroad companies is void, (19 Cal., 513; 12 Mich., 168,) unless such unconstitutional part can be disregarded and practical effect given to the remainder thereof. But to give effect to that section of the constitution, we submit that the

report should show on its face that damages were assessed, value estimated, etc., irrespective of benefits. 21 Penn. St., 100; 25 id., 394; 35 Cal., 247, 258; 2 Harrison, 25. "Merely *assessing damages* allows a consideration and estimate of benefits." 23 Conn., 189.

5. And said report is fatally defective in not showing on its face what land the commissioners appraised the value of, and for the taking of which they made assessment of damages, that is as to plaintiff's land where the seven and 63.100 acres were located, the form and shape thereof, etc. If said report is valid, we would ask whether all of plaintiff's quarter-section, containing 160 acres, is taken for the use of the company, or whether only seven and 63.100 acres are taken; and if only the latter, then which seven and 63.100 acres is it that is taken? It appears to us that the language of the report clearly shows an attempted taking of the whole tract of 160 acres, and an appraisement of seven and 63.100 acres without showing its location. 5 Ohio, 458; 6 Selden, 509; 35 Mo., 302; 13 Wis., 643; 27 Ala., 437; 24 Ill., 647; 5 Peters, 457; 9 Ohio State, 599; 14 Howard, 76; 3 B. Mon., 368.

6. The written notice required by § 49 of ch. 23, was not given to plaintiff. Plaintiff claimed that he was an actual occupant of the land long before, and ever since, the first map and profile were filed; and from the agreed statement of facts it appears that he has been in the actual possession of his said land ever since the 4th of September, 1867, and that all that time it has been improved by a dwelling-house, stable, etc., and that ever since the 1st of May last said Hunt has, by *himself*, been in such actual possession, and had the keys to the house and stable, and been on his said land every few days looking after and caring for the same, etc. It is true plaintiff did not reside on the land, but there is a great difference between residing upon and merely actually occupying a piece of land. The word *occupant* has a legal, technical and well-defined meaning, and has the same meaning at common law as the word "possession." And any other

notice than such as the law requires amounts to nothing. 30 Ill., 215; 53 Barb., 407; 5 Me., 36; 2 Nev., 34; 11 Conn., 102.

And we submit that the proceedings on the part of defendants are not sufficient to give or confer any right of way, but are defective and insufficient; and therefore we ask that this court allow the injunction.

*Robert Crozier*, for defendants in error:

There is no error in the judgment of the district court refusing the injunction prayed for. Although the court below did not specially say that the case made by the plaintiff in his petition would entitle him to an injunction, yet there is an intimation in the opinion that if the proof sustained the allegations thereof an injunction ought to be allowed. But the defendants do not assent to the correctness of this position. . The theory of the law apparently adopted by the plaintiff is, that if the railroad company, although attempting in good faith to comply with the provisions of the statute upon the subject of appropriating lands for railroad purposes, should omit any of its requirements, an injunction should be allowed to restrain the appropriation of the land until every provision, no matter how technical, shall have been observed. We deny that such is the law.

The decisions cited from the books depend to such an extent upon the particular facts in each individual case, that it would be exceedingly difficult to deduce therefrom a general rule that would not work manifest injustice if indiscriminately applied. The very essence of an application for an injunction is, that on the case made, the petitioner is driven to it as a last resort, so far as judicial tribunals are concerned, in the assertion of his rights. Every threatened wrong that might be imagined will not justify the interposition of a court of equity. It is only such as are, under the particular circumstances, remediless by "due process of law," that will justify the interposition of *preventive* justice. That this is such a case cannot be maintained.

In this connection, counsel for the defendants insists upon these propositions: 1st. In proceedings for an injunction to restrain the appropriation of lands for railroad purposes, the statute directing the mode in which the condemnation is to be made, is not to be strictly construed; and 2d. Where there has been an attempt, in good faith, to comply with the requirements of the statute, and a failure in some particulars, an injunction will not lie, unless the omissions would result in injury remediless in the ordinary action for damages.

With reference to the first proposition, no argument is needed to demonstrate that railroad companies do not get the right to appropriate, for railroad purposes, the lands of individuals, by virtue of the statute directing the manner in which it shall be done. The state has the eminent domain for public use, and it is not delegated to it by any particular provision of the constitution. It results from the fact of the organization of a state government. Upon a compliance with the act upon the subject of corporations, a railroad company acquires from the state the right to appropriate the land necessary for its road. The right then arises. How it shall be exercised, is prescribed by the statute on the subject of condemnation. It is not the latter statute that gives the right; it is a compliance with the former that has that effect. Hence it ought not to be said that the statute prescribing the mode of exercising the right is one in derogation of common right, and to be strictly construed. It is in its nature remedial, and a substantial compliance, in a proceeding for an injunction, is all that can rightfully be required. It is unnecessary to concede that it might be different in an action for trespass, as the question is not before the court.

As to the second proposition, it must be recollected that it does not appear from the petition or the proof, that the plaintiff has not an adequate and complete remedy in the ordinary action for damages. Taking every allegation as true, it cannot be said that a jury would not be competent to compensate him fully. At the time the application for an injunction was

made, he had an adequate remedy in two directions. One by appeal from the award of the commissioners, and the other in an action for damages — in either of which full compensation might have been made. The constitution provides that his land shall not be taken "until full compensation therefor be first made in money, or secured by a deposit of money." The gist of the provision is the amount and the time at which the same shall be paid or secured. The machinery through which the former shall be ascertained, is left to the legislature. That body has acted upon the subject. The ultimatum provided for is the estimate of twelve men. "To this complexion it must come at last." He could have appealed, and he can prosecute his action. In either event it must come to the same arbitrament; and there is no pretense that the defendants are not amply able to respond in the amount claimed.

It will be contended, probably, that the acts complained of "would produce injury to the plaintiff," and hence, under § 238 of the code the injunction ought to have been allowed. This section was not intended to enlarge the powers of the court as to the allowance of injunctions. Literally, it would seem to authorize the court to interfere thus extraordinarily to prevent the nudest trespass, or the perpetration of the most petty misdemeanor. Such certainly was not the intention of the legislature. They must have used the words above quoted with reference to others of their acts at the same session, and not for the purpose of overturning all the received notions of the law upon that subject. They must have intended to leave the law upon that subject as it had stood for a century, rather than have intended a change so ridiculously radical as a literal rendering would accomplish. Doubtless they use the word "injury" in a restricted, or technical sense, intending it should be applicable in a case where compensation could not be obtained in the ordinary action. No other interpretation is consistent with good sense or the canons of construction.

The opinion of the court was delivered by

VALENTINE, J.: The questions involved in this case we decide as follows:

I. The statutes of Kansas authorizing real estate to be appropriated to the use of a railroad company for a right of way (Gen. Stat., pp. 212 to 215, ch. 23, §§ 81 to 89; Laws of 1870, pp. 155, 156, §§ 1, 2,) so far as they apply to this case do not contravene the provisions of § 4, article 12, of the constitution, and are not unconstitutional or void.

II. An owner of land is not in the actual occupancy of the same within the meaning of § 49 of the act concerning private corporations, (ch. 23, Gen. Stat., p. 203,) unless he is an actual resident thereon; and where such owner is not an actual occupant of the land notice of the appropriation of a part of the same for a right of way for a railroad given by publication in a newspaper, as provided by amended § 86 of said act, (Laws of 1870, p. 155, § 1,) is sufficient. See also Gen. Stat., p. 1000, § 1, subdivisions 23, 24, 25.

III. It is not necessary under § 48 of said ch. 23, concerning private corporations, that a railroad company should file with the county clerk a map and profile of the *entire* line of their proposed road through the county before they can apply under amended § 87 of said act, (Laws of 1870, 156, § 2,) to have commissioners appointed to make an appraisement and assessment of damages to any part of the property along the line of said road. A map and profile of what the company desires to have appraised, etc., is sufficient.

IV. Such commissioners must appraise the value of the land appropriated, and assess the damages to that not appropriated, irrespective of any supposed benefits to that not appropriated. *St. Joseph & Denver C. Rld. Co. v. Orr*, 8 Kas., 419.

V. It is not necessary that the report of the commissioners should show upon its face more specifically what portion of any particular tract of land was appropriated or appraised, or for the taking of which damages were assessed, than to

show that the land appropriated was a strip through a certain quarter-section of land (describing particularly the quarter-section,) one hundred feet wide along the line proposed by the railroad company; for such strip cannot vary from that shown by the map and profile of the company filed in the county clerk's office, and such map and profile make it definite and certain what land is appropriated.

VI. It is not necessary where only a strip of land one hundred feet wide is taken, that the report should show expressly that the commissioners deemed such strip necessary.

VII. Where the commissioners in their report use numerals only to express the valuation of the land taken, and the damages to that not taken, and where it is evident from the report that the commissioners intended that such numerals should represent dollars and cents, the report is not void because the commissioners omitted to use either the dollar-mark, or the words "dollars" and "cents," or some abbreviation of the same.

VIII. Nor is the report void because it does not show that any crops, buildings, or improvements were valued, or damages thereto assessed, or that there were no such crops, buildings or improvements on the land to be taken or damaged by the appropriation of such right of way.

IX. Nor is the report void because it simply shows that the commissioners valued the land taken, and assessed the damages to that not taken, and does not show affirmatively that they did not deduct from the said value or damages anything for benefits to the land not taken.

We shall not discuss the several questions herein decided except the seventh. We shall however here quote the very able opinion delivered by the judge of the court below, which we think sufficiently discusses them, and which we think gives sufficient reasons for the decision of the questions therein discussed. The said opinion reads as follows:

"The plaintiff has been the owner of the premises described in his petition since the 4th of September 1869, and has been in possession of the same continuously from that

time to the present, part of the time personally, and part of the time by tenants. They are partially improved, and have upon them a dwelling-house and two stables. Since the 1st of May last no person has resided on them, but the plaintiff has had the key to the dwelling-house during this time, and every few days has visited them to look after and care for the same. No part has been in cultivation during the present year.

"The railroad company, with a view to obtaining the right of way for a road running westwardly from the city of Leavenworth across the premises of the plaintiff to the western boundary of the county, and thence on to the city of Denver, in Colorado, instituted proceedings to condemn such right of way through this county, and claiming to have complied with the provisions of the statute relating thereto, have entered upon the plaintiff's land and commenced to grade the road. It is now claimed by the plaintiff that these proceedings were irregular and void; and that the defendants should be enjoined from constructing their road across his premises until a right so to do is acquired by a strict compliance with the provisions of the law pertaining thereto. It is claimed the statute under which these proceedings were had is, in an essential particular, in conflict with the provisions of the constitution, and therefore null and void in whole. I cannot yield assent to this proposition. The constitution provides in substance, that no right of way shall be appropriated by any corporation until full compensation be made in money, or secured by a deposit of money, irrespective of any benefit from any improvement proposed by such corporation; and it is claimed that the statute contemplates that the benefits which may accrue from the proposed railway shall be taken into consideration in the assessment of damages. It is unnecessary to quote the provisions of the statute bearing upon this question. It is sufficient to say that they do not in terms, or by fair implication, provide that the benefits which may accrue from the construction of the road shall be taken into consideration in determining the compensation to be made to the owner. Nor is it conceded that the statute would be void, even though the repugnance claimed by the plaintiff actually existed; but it is unnecessary to determine this question, and therefore I pass it without any further observation.

"Several objections are made to the regularity of the proceedings to condemn the right of way. The law requires a map and profile of the route of the proposed road into or

through the county, to be filed with the county clerk before commencing the construction of the road. The distance of the company's road in this county is about eighteen miles. At the time the commissioners to lay off the route and assess the damages were appointed by the judge, (Oct. 3, 1871,) a map and profile of only the first division of ten miles had been made and filed with the clerk, and a map and profile of the entire distance through this county was not filed until the 9th instant, (Nov., 1871,) on which day the report of the commissioners was also filed in the same office; but the plaintiff's premises are situate within the limits of the first division. If no map and profile of that part of the road which runs across the land of the plaintiff had been filed, as the law requires, at the time the commissioners were appointed and the published notice of thirty days given, it is possible the omission would have been fatal, and the entire proceedings void as to the plaintiff. But a map and profile from the initial point for a distance extending beyond the premises of the plaintiff had been filed in due time, and this secured to the plaintiff every benefit and advantage that could possibly result from the filing of a map and profile of the remaining part of the road in this county, and every purpose of the statute, so far as the plaintiff was concerned, was thereby subserved.

"It is also claimed the report of the commissioners does not state that it is necessary to take the quantity of land the company seek to appropriate, nor sufficiently show what quantity was actually condemned. As to the last point, I think it does show with reasonable certainty the quantity taken. It shows it to be a strip 100 feet in width along the line proposed by the company, which I understand as referring to the map and profile filed with the county clerk; and that it amounts to seven and 63.100 acres. This is sufficient both as a description and designation of the quantity of land taken. As to the other point, § 82, p. 211, Gen. Stat., provides: 'Upon application being so made in writing, such board of county commissioners shall forthwith proceed to lay off such route, side tracks, etc., for such distance through their said county as may be so desired, and of such width within the limits aforesaid, and upon such location as may be desired by such corporation, having the same carefully surveyed, and ascertaining correctly the quantity of land necessary for such purposes.' The report contains no statement that the 100 feet in width is necessary, but I do not think the statute

requires this.  It says the commissioners, within the limits prescribed by law, are to lay off the route, side tracks, etc., of such width and upon such location as may be desired by the corporation; and having done this, they are then to carefully ascertain the quantity necessary to be taken.  When the statute says the route shall be laid off of such width and on such location as the corporation may desire, it does not mean that the width and location of the route shall be left to the judgment of the commissioners.  They are not to determine whether it is necessary or not to take the quantity of land sought to be appropriated by the company, but are to lay off the route as wide as the company may desire, so long as the limits of the statute are not transcended.  If, then, the commissioners are not to determine the necessity of taking the quantity of land desired by the company, there would be a manifest impropriety in requiring of them a statement that there was a necessity for the quantity taken.

"Another objection to the report is, that it does not show that the damages were assessed as the law requires; that is, irrespective of any benefits which may be supposed to accrue from the construction of the road.  It is true the report does not state that the commissioners, in assessing the damages, did not take into consideration the benefits which might result from the proposed road; but it does state that, having taken the oath required by law, they met at the proper time and place 'and proceeded to lay off the route for said railroad along the line proposed by said company, and to appraise the land to be taken by said company, and assess the damages occasioned thereby;' and that they 'do award compensation and damages in the premises as follows, viz.'  And then follows a tabular statement showing the owner's name, description and quantity of the several tracts over which the route passes, the width and quantity of the land appraised, its value, the damages assessed to each several tract, and the total compensation allowed, including therein the appraised value of the land taken, and the damage awarded the owner.  The law requires the report to embrace the proceedings of the commissioners, which are, in respect to the matter now under consideration, the assessment of all proper damages occasioned by taking the right of way for the purpose proposed.  The report says the damages are assessed at a certain sum stated.  There is no statement or suggestion that any supposed benefits were taken into consideration.  As the law expressly requires that the commissioners shall not take the

accruing benefits into consideration, I think the presumption should be, that the law was obeyed by them in this respect, and therefore that their report need not in terms state that the law was not violated in this particular.

"But a further and final objection presents a serious and difficult question to satisfactorily determine. Sec. 49, p. 203, Gen. Stat., is as follows: 'The company shall give written notice to all actual occupants of the land over which the route of the road is so designated, and which has not been purchased by or donated to the corporation.' The plaintiff has not donated or sold the right of way to the company, and no written notice has been given him, though verbal notice of the route over his premises was given him by the chief engineer; but I cannot consider such a notice as sufficient under the statute, and if the plaintiff was an actual occupant of his premises within the scope and meaning of this provision of the law, I should be compelled to hold the omission to give the written notice fatal, and that the company acquired no right whatever to the right of way, and the plaintiff would be entitled to his order of injunction. It will be borne in mind that the premises of the plaintiff have not been in cultivation during the present year, and that while the plaintiff has had the key to the dwelling-house, and every few days has visited his place to look after and care for it, no one has lived thereon since the first of May last. The question is, is the plaintiff an 'actual occupant' within the meaning of the section just quoted, and therefore entitled to the personal written notice therein provided for? The law requires a general notice to all, to be published for thirty days, and for special reasons requires an additional personal notice in writing to each actual occupant. Now it will be conceded as a general rule that the owner of real estate which he cultivates or improves, is to be deemed an occupant of it, although he does not reside thereon; but in my judgment the words 'actual occupants,' as used in this section, are to be interpreted according to their more general and popular usage and acceptation. I think the word 'actual' was intended to qualify and explain the word 'occupants,' and that while the last-mentioned word, standing alone, might be considered as equivalent to the phrase ' parties in possession,' yet as limited and qualified by the word 'actual' preceding it, it has a more restricted and popular signification. It certainly emphasizes and adds force, or rather intensity, to the idea, and it seems to me was only intended to apply to persons actually residing upon the

premises at the time the notice should be given. It will be observed that the notice is not to be served upon the owner, but upon the 'actual occupant' wherever he may be, or whatever his right or title to the premises he is occupying; from which I think it is evident, the intention in requiring the special notice in writing to the person actually a resident upon the land over which the route runs, was to afford him an opportunity to protect his interests whatever they might be, and in case he was a mere tenant, that he could give timely information to the owner, it being supposed that if the party residing on the land was not himself the owner he would know the whereabouts of the latter. (Gen. Stat., 1000, clauses 23, 24, 25.) To hold that because land over which the route of a proposed railway passes, is improved in whole or in part, but upon which no one is residing, the railroad company must at their peril give this written notice to the person making these improvements, no matter where he may be, would in effect substantially render the law ineffectual, in my judgment. Suppose he is in the military or naval service, or on a journey in a foreign country, or possibly a citizen and inhabitant of another country, must these great highways of commerce, so vital and necessary to the development and prosperity of our state, wait on the performance of an act in many cases quite difficult, and in not a few impossible for months and even years? for example, a rude dwelling on the prairie, with perhaps a few acres broken up, but no inclosure, and upon which no one resides, the party far away, or unknown, etc. I cannot think the legislature have conferred on companies the right to appropriate the way for railroads upon an impossible condition. The injunction prayed for will be refused."

So far as said opinion reaches, we agree with the district court. But it is claimed that because the commissioners did not use the dollar-mark, or the words "dollars" or "cents," or some abbreviation thereof, or some other express word or character to show that the numerals which they used in their report to express the valuation of the land taken, and the damages to that not taken, that the report is void. We do not think so. The commissioners reported among other things that they "proceeded to lay off a route for said railroad along the line proposed by said company, and to *appraise* the land to be taken by said company, and *assess* the *damages*

occasioned thereby, and to *award compensation* and *damages* in the premises as follows, viz.: * * * Owners' names, F. R. Hunt; description, N.E.¼ section 21, township 8, range 22; acres in tract, 160; feet in width appropriated, 100; acres appropriated, 7.63; value thereof, 572.25; damages sustained, 527.75; total value and damages, 1100.00." The latter part of this quotation, commencing with the words "owners' names," is in tabular form. The commissioners, as will be seen from this quotation, used the words "appraise," "assess," "award," "compensation," "damages," and "value" with reference to said numerals—words which in contemplation of law can have no meaning at all unless the figures they refer to are intended to represent money. In legal contemplation land cannot be *assessed, appraised,* or *valued,* nor can *compensation* or *damages* be *awarded* therefor, except in money. Money is the legal representative of all other property, and is the only legal representative of other property. When any one speaks of value or damages he must mean value or damages in money, as that is the only legal measure of value or damages known to the business world. This latter proposition is established not only by the laws of this country, but is also established by the universal custom and usage of all civilized nations. But it may be claimed that there is nothing in this report to show what kind of money the commissioners intended by said numerals, whether American or Foreign, whether eagles, dollars, dimes, cents, or mills. There certainly need be no difficulty upon this point. If these numerals are intended to represent money at all, they must represent whatever may be legally denominated money in this country, and nothing else. They must represent whatever the laws of the United States declare to be or recognize as money. Neither can there be any difficulty in determining what denomination of money said numerals are intended to express. Dollars are the legal money-units of this country, made so by the laws of the United States. 1 Stat. at Large, 248, § 9; 1 Bouvier's Law Dict., title, *Dollar*. Hence, whenever figures are used intending to represent

money such figures must of course be understood to represent "dollars," unless a different intention is clearly expressed. The point or dot, resembling a period in punctuation, separating certain figures on the right from those on the left, is the decimal point. It makes the figures on the right decimals of a unit of whatever is intended to be expressed by those on the left. Those on the left as we have already seen are intended to represent dollars, hence those on the right must represent decimals of dollars. As only two figures on the right are thus separated from the others, these two figures must represent hundredths of dollars, or in other words, "cents." This is well-settled by almost universal usage everywhere in the United States. It is not necessary that every word or phrase used in any instrument should be written out in full in order that the instrument shall be valid. In many cases characters, figures, symbols, signs, marks, points, or abbreviations, may be used instead of the words which they represent. Thus, the character "&" stands for "and;" the Arabic numerals 1, 2, 3, 4, etc., stand for one, two, three, four, etc.; "&c." and "etc.," respectively stand for "and so forth;" "$" for dollars; "c.," "ct.," "cts.," for cent, or cents; "m.," for mills; "lt.," for lot; "bk" for block; "tx.," for tax; "vl.," for valuation; "T.," for township; "R.," for range; "sec.," for section; "qr-sec.," for "quarter-section," and "pt.," for part, etc. (Blackwell on Tax Titles, (2 ed.) 202, and cases there cited.) We suppose that all the usual signs or symbols used in mathematics, chemistry, music, astronomy, and other sciences, the characters used for denoting certain weights and measures, the marks of punctuation, and the ordinary abbreviations used in written composition, might be used in proper cases without invalidating the instrument in which they should be used. Even in some cases whole words or whole phrases may be omitted entirely—simply being understood—without in the least invalidating or affecting the instrument from which they are thus omitted. Scarcely anything is more common in written composition than what is termed in grammar an "ellipsis," and yet it is

seldom that an ellipsis would invalidate an instrument. The language is just as good English, and just as valid in law, as a rule, with the ellipsis as with every word and phrase written out in full. Even many of the characters, figures, signs, symbols, marks, points, and abbreviations we have mentioned are by immemorial usage just as much a part of the English language as the letters of the alphabet themselves; and just as much a part of the English language as the words formed by combinations of these letters. Even these letters are only arbitrary characters, borrowed from the Latin at not a very remote period. In our language there are many words each of which have many different significations, or shades of meaning; there are many different words which express nearly the same idea, that is, which are nearly synonymous; and there is scarcely any limit to the order or arrangement of words in a sentence. A wide and almost unlimited discretion is allowed in the use of language. All that is required is, that the language shall be intelligible. The great end and object of all language is attained when the person using the language has made himself to be perfectly understood. This we think the commissioners in their report have done. No one can read the report of the commissioners and mistake their intention.

We have been probably more elaborate upon this point than is necessary. The reason we have discussed the question at such length is because counsel for plaintiff in error have referred us to certain decisions concerning the validity of tax titles which seem to lay down a different doctrine. It is well known that courts have usually construed everything strictly, and sometimes illiberally, as against the holders of tax titles. Such should not be so in this case. The owner of the land can, in condemnation proceedings, appeal from the valuation and appraisement of the commissioners if he be dissatisfied with the same, and have his appeal tried before a jury in the district court. (Laws of 1870, page 155, § 1.) We think therefore that we should not construe the report of the commissioners upon this subject either liberally or illiberally,

strictly or loosely, but should construe it reasonably. In those tax cases referred to courts themselves admit that they construed the proceedings strictly as against the holder of the tax title, and do not claim that they construed them reasonably. The judgment of the court below is affirmed.

All the Justices concurring.