# CHARLESTON

Chesapeake & Ohio Ry. Co. *v.* Deepwater Ry. Co. *et al.*

Submitted March 28, 1905.   Decided April 25, 1905.

| 57 | 641 |
|----|-----|
| 58 | 384 |
| 58 | 431 |
| 57 | 641 |
| e62 | 306 |
| 62 | 353 |
| f62 | 509 |

1. RAILROADS—*Right of Way—Condemnation Proceedings.*

   Land covered by a location for the purposes of its road, made by a railroad company, and acquired by it by purchase from the land owner, may be taken, under the power of eminent domain, by another railroad company which has made an earlier location of its road on the same land, but the company owning the land by purchase, may defeat the condemnation proceeding by showing that its location upon the same was first made.   (p. 650.)

2. RAILROADS—*Right of Way—Priority of Location Governs.*

   As between rival railroad companies, claiming the same location, priority of location in point of time gives superiority of right to the use of the land, covered by the location, for railroad purposes. (p. 650.)

3. RAILROADS—*Eminent Domain—Rights of Railroad First Located.*

   Location of a railroad, within the legal definition of the terms, is a proceeding in the exercise of the power of eminent domain, amounting to an appropriation of the particular place selected for the site of the road, as against all persons except the owner of the land, and a person who may have perfected a prior location thereon; and as to the land owner, it gives a right to acquire his title by purchase or further exercise of the power of eminent domain, paramount to that of a company, claiming under a subsequent location.   (p. 652.)

4. RAILROADS—*Maps and Profiles Not Necessary to Location.*

   Neither the filing of a map and profile of the proposed road, nor the commencement of condemnation proceedings is an essential step in making such location. Both may be deferred until after the location is perfected.   (p. 666.)

5. RAILROADS—*Maps and Surveys,—When Effective.*

   A mere survey made by the engineers of the company, not adopted or determined upon by the corporation itself, by act of its board

of directors, as the location of its road, is not an appropriation or location, giving priority of right as against third persons.  (p. 667.)

6.   RAILROADS—*Location—What Sufficient.*

A survey staked out upon the ground, as a center line, a preliminary line, or an actual location, whether delineated on paper or not, if adopted by the corporation as aforesaid, is a sufficient location.  (p. 667.)

7.   RAILROADS—*Rival Companies—Location—What Sufficient as Between.*

A location as between rival companies need not be exact as to the width of the right of way claimed or other matters of mere detail. If the site intended to be held is substantially shown, the location is sufficient.  (p. 667.)

8.   RAILROADS—*When Surveys May Be Adopted by.*

A survey, made by promoters of a railroad corporation for its purposes, before the company is incorporated, or by an existing railroad company, for an extension of its road, before filing, in the office of the secretary of state, a certificate of extension as required by section 65 of chapter 54 of the Code, may be adopted as a location, after incorporation or the filing of the certificate as the case may be.  (p. 667.)

9.   RAILROADS—*Rival Companies—Seizure of Location in Good Faith.*

If acting in good faith and diligently prosecuting the enterprise it professes to have undertaken, the construction of its road, a railroad corporation may sieze and hold, as against a rival company, by location thereon, land on any part of its proposed route, without having made a survey of its entire road.  (p. 667.)

10.   RAILROADS—*Location—Evidence of Location.*

Though not the only mode of adopting a survey so as to make it a location, the filing of a map of it in the office of the secretary of state, by order of the board of directors of the company, is *prima facie* proof of such adoption    (p. 667.)

11.   RAILROADS—*Location—Evidence.*

The mere filing of such plat in such office, without proof that it was authorized by the corporation, is not evidence of an adoption of the survey shown by it.  (p. 667.)

12.   RAILROADS—*Location—Adoption by Directors Necessary—Acts of Agents.*

A location can be made only by act of the corporation through its board of directors, but acts done by agents under the orders of the board of directors, for the purpose of claiming and holding a location designated by the board as such, are evidence of intent on the part of the board of directors to claim and hold such location.  (p. 668.)

13. RAILROADS—*Construction of Resolution—Extrinsic Evidence— Parol Testimony.*

To aid in ascertaining the true meaning and purpose of a resolution passed by the board of directors of a corporation, the terms of which are not certain and definite, resort may be had to the circumstances under which it was passed, the situation of the company, the object of the resolution and the meeting at which it was passed, and the contemporaneous and subsequent conduct of the corporate authorities in respect to it, and parol evidence is admissible in applying descriptive terms used to the subject matter. (p. 672.)

14. RAILROADS—*Action of Stockholders and Directors Prima Facie Evidence of Location.*

A railroad company having caused to be surveyed a portion of the route of a contemplated extension, the right to make which had not been obtained by compliance with the statutory regulations, and perceiving the intention of a rival company to seize part of the location so surveyed, hastily held a meeting of the stockholders at which maps of the surveys, not as yet filed as required by law, were produced and examined, and, after an examination of the maps, passed a resolution, authorizing the extension, directing it "to be located on the most practical route as shown on the maps and profiles filed as required by law," and ordering certain persons "to make the necessary filings· as required by law as fast as the same may be prepared." On the same day and immediately afterwards, the directors held a meeting, and, with the said resolution of the stockholders and the maps before them, passed a resolution, authorizing and directing the chief engineer of the company "to carry out the surveys and extensions of same as authorized by the stockholders in the meeting of this date and to do all things further that may be necessary for carrying out said resolution," and directing filings to be made "as fast as the same may be prepared." At the earliest possible moment after the adjournment of the meeting of the directors and on the same day, the resolution of extension and the maps as far as made, were filed in the office of the secretary of state. *Held,* That the references in the resolutions to maps included those already made, and that the act of ordering them filed is *prima facie* proof of adoption of the surveys shown on them. (p. 670.)

15. PRIVATE CORPORATIONS—*Evidence—Books and Records as Evidence.*

Books and records of a private corporation are not admissible evidence in its favor in a controversy between it and a stranger, respecting title to property or other right directly in issue between them, to prove that the acts therein recited were performed, at the time and in the manner therein stated, except as memoranda in connection with the oral evidence of witnesses who testify from their personal knowledge as to such transactions. (pp. 685, 688.)

16. PRIVATE CORPORATIONS—*When Books and Resolutions Admitted as Evidence.*

After proof in such case, by competent evidence, that certain corporate acts were performed and written memorials thereof made in the form of resolutions or otherwise, the books and records of the corporation are admissible to identify and prove the character and terms of such instruments. (p. 688.)

17. RAILROADS.

A claim of priority of location by one railroad company against another, set up in a condemnation proceeding, is the assertion of a right against a stranger to such corporation, and the records of the respective litigating corporations are not evidence in their favor except to the extent and for the purposes above stated. (p. 691.)

18. RAILROADS—*Compensation for Improvements.*

A railroad company is not entitled to compensation for improvements made by it on property upon which it has entered, pending its proceeding to condemn the same, upon the reversal of the final judgment in its favor, subsequently obtained in the action, and an adjudication against its right to condemn the land. (p. 695.)

19. RAILROADS—*Rival Condemnation Proceedings—Practice.*

In such case, upon reversing the judgment, and ascertaining that the action cannot be maintained, the appellate court will order restitution to the land owner of the possession of the premises and remand the case with leave to the plaintiff in error to sue out a writ of possession, and a direction to dismiss the action with costs, after the affectuation of such restitution. (p. 698.)

20. *Quaere.*

*Quaere.* When one internal improvement company has been erroneously adjudged to have the right to condemn and take land belonging to another such company, may the plaintiff be stayed from taking possession thereof by an order of *supersedeas* or other process. (p. 697.)

Error to Circuit Court, Raleigh County.

Action by the Chesapeake & Ohio Railway Company against John L. Trail and others. Judgment for plaintiff, and the Deepwater Railway Company brings error.

*Reversed.*

A. N. CAMPBELL and BROWN, JACKSON & KNIGHT, for plaintiff in error.

SIMMS & ENSLOW and W. P. HUBBARD, for defendant in error.

Poffenbarger, Judge:

Although, in form, a proceeding by one railroad company, to condemn, for its road bed, a strip of land owned by another railroad company, which purchased said land for its road bed, this case is in realty a controversy between said railroad companies over the question of priority of right to appropriate the strip of land in question; and calls for settlement of the principles governing the rights of rival companies contending for the same location for their respective roads.

The conflict is between a branch line of the Chesapeake and Ohio Railroad, called the Piney Creek Extension, commencing at Prince Station on the main line and on New River and running for several miles up Piney Creek and its branches and thence across the divide to the waters of the Guyandotte River; and an extension of the Deepwater Railway, commencing at Glen Jean on Loup Creek, another branch of the New River, and not far from Piney Creek, and running across the divide to the waters of the Guyandotte River, and thence across the mountains to the Bluestone River. The point of conflict is a place called Jenny's Gap on the ridge between the waters of New River tributaries and those of Guyandotte River branches. There is space for two locations through this gap, but the one in question is preferable to the other.

The main line of the Chesapeake and Ohio Railway Company from Richmond, Virginia, to the Ohio River was completed in the year 1873, and, since that time, branch lines, as feeders to it, running up many of the tributaries of Kanawha and New Rivers into the rich coal and timber regions of that section of the state, have been built. Few, if any, of these branch or lateral roads exceed fifty miles in length, and most, if not all, of them have been constructed and operated under the original articles of incorporation, by authority conferred by section 69 of chapter 54 of the Code, which provides that: "Any railroad company organized under this chapter, may build and construct lateral and branch roads, or tramways, and of any gauge whatever, not exceeding fifty miles in length" &c. In the exercise of the privilege conferred by this statute, the Piney Branch of the road was surveyed in the years 1898 and 1899, and, in the following year,

about fourteen miles of it, reaching a place called Raleigh Station, about three miles from Raleigh Court House, was completed. From this point, the survey of 1899, followed Piney Creek, in a southwesterly direction, to the mouth of Soak Creek, then, this branch of it in the same direction for a short distance, and then crossed a dividing ridge to the Winding Gulf, a tributary of the Guyandotte River, which it followed to its mouth and then the Guyandotte, in the same general direction, almost, or quite, to Pineville. Afterwards, but in the same year, another survey, preliminary in character, of part of this route was run on a different location. Instead of crossing the divide from Soak Creek to Winding Gulf, it followed Soak Creek to its head in a more westerly direction and crossed the dividing ridge to Slab Fork of the Guyandotte, and followed it in a southwesterly direction for some distance and then in a southerly direction until it connected with the first line at the Guyandotte. This last line ran much nearer to Jenny's Gap than the first one. The Slab Fork survey seems to have been merely preliminary, without projection of location or recordation of plat, but the Winding Gulf location was projected, and that part of it which crosses the divide from Soak Creek to Winding Gulf, a distance of about four miles, was actually located, that is, the proposed right of way was staked off on the ground as well as delineated on a plat. The map of this projected Winding Gulf location was filed in the office of the secretary of state.

The original certificate of incorporation of the Deepwater Railway Company, bearing date January 28, 1898, calls for a route from Deepwater on the Kanawha River up Lower Loup Creek, thence across the divide and down White Oak Creek to its mouth at Dunloup Creek at or near the village of Glen Jean. Early in the year 1902, conceiving the idea of an extension of this line in a southerly direction through the coal fields of West Virginia and thence to the sea board, preliminary surveys for such extension were ordered. The engineer first commenced at Glen Jean and crossed the divide to Piney Creek which he followed to its source in the Flat Top Mountain, and then crossed the mountain to the waters of Camp Creek which he followed to Bluestone River. About the first of April, 1902, he was ordered to make another sur-

vey by a different route farther west, through Jenny's Gap and Clarke's Gap, in order to reach better coal territory. The route first examined was east of the Chesapeake and Ohio Winding Gulf route. The other is west of it. Instead of going back to Glen Jean and making the examination of this last route from that point, the engineer commenced at Clark's Gap, near the southern end of the route, on the 30th day of July, and ran about a mile toward the Bluestone River down Widemouth Creek. Then going back to Clark's Gap he started north, down Barker's Creek to the Guyandotte River, thence up the Guyandotte River to the mouth of Slab Fork, thence up Slab Fork to the mouth of Low Gap Branch toward Jenny's Gap. At a point about seven miles from Jenny's Gap he stopped and went up into the gap and ran his preliminary line back to where he had left off. This connection was made on the 30th day of August. On the same day, a party of surveyors of the Chesapeake and Ohio Railway company made their appearance in Jenny's Gap, but the Deepwater Railway party projected their location through the gap and, on the first and second days of September, the latter staked off their line through it. At that time, the north end of the line namely, the part between Jenny's Gap and Glen Jean, had not been surveyed at all. Nor, at the time had the Deepwater Railway Company ordered, or agreed to make, an extension of its road beyond either of the termini fixed by its articles of incorporation. By section 53 of chapter 54 of the Code, a railroad company, with the consent of the stockholders, owning a majority of the stock, present at any general or special meeting, may so extend its road, subject to the proviso, "That such corporation before commencing any such extension in this state, shall file in the office of the secretary of state, a certificate stating the point at or near which such extension in this state shall commence and terminate." Upon discovering the purpose of the Chesapeake and Ohio Company to occupy Jenny's Gap, the Deepwater Company hurriedly called and held a stockholders' meeting which adopted a resolution of extension on the 2d day of September, 1902, while the work of staking off its location through the gap was in progress. On the same day a meeting of the directors was held at which the following resolution was adopted: "On motion, Wm. N. Page,

Chief Engineer and Attorney in fact of the Deepwater Railway Company is authorized and directed to carry out the surveys and extensions of same as authorized by the stockholders in their meeting of this date and to do all things further that may be necessary for carrying out said resolution. On motion C. P. Howard and M. Curtis, or either of them, were directed to make the necessary filings as required by law as fast as the same may be prepared.'' A certified copy of the stockholders' resolution of extension and maps of the projected location through Jenny's Gap, down Low Gap Branch, Slab Fork and Guyandotte River to the mouth of Barker Creek and thence up that creek to within a few miles of the Wyoming and Mercer county line, except a space of six or seven miles immediately south of the gap, were on said 2d day of September, 1902, filed in the office of the secretary of state. The map of its actual, staked, location through Jenny's Gap, about six thousand feet in length, was filed in said office on the 8th day of September, 1902. On the same day, a map of the projected location over the space just south of Jenny's Gap was filed and a map of the residue of that space was filed on September 11th. These maps were filed in the proper county court clerk's offices on the same or about the same dates, as those on which they were filed in the office of the secretary of state. From the date of contact with the Chesapeake and Ohio engineers, the Deepwater Railway engineers and officials pressed the work of location of their entire line and completed the same February 27, 1903, filing the maps as fast as the data for them could be procured and they could be prepared from it.

When the Chesapeake and Ohio engineers were met in Jenny's Gap, they were prosecuting a survey which they had commenced at Raleigh Station on July 7, 1902, and carried to within six or seven miles of the gap, and then gone to the summit to run back and make connection as is usual in locating a road to the summit of a ridge or hill. They afterwards completed their preliminary survey through the gap and down Low Gap Branch to Slab Fork and connected it with their old survey made in 1899, and a map of their projected location by this route was completed and filed in the secretary of state's office September 11, 1902. On the same day, they filed a map of the old 1899 survey down Slab Fork from

the mouth of Low Gap Branch to the Guyandotte river, where the new route tied on to the old Winding Gulf survey, a map of which had been filed in 1899. Whether on the date of the filing of the maps of the new route, it had been adopted by any corporate action is a question much debated, and a statement of the facts bearing upon it will be given in connection with the discussion when reached. The Chesapeake and Ohio Company, after filing these maps, went on and made actual location of its new route, completing the same about November 1, 1902. In the month of October, 1902, the Chesapeake and Ohio Company caused a second survey through Jenny's Gap to be made so as not to conflict with the Deepwater Company location and it was ascertained by this survey that such other route was practicable, though less desirable than the one first selected. However, this second survey was actually located, staked off on the ground, but whether a map of it was ever filed seems not to appear from the record.

On the 2d day of October, 1902, the Deepwater Company acquired, by deeds from John L. Trail and wife and Isaac N. Cook and wife, the fee simple title to the land in Jenny's Gap on which its location was made, and about the 30th of December, 1902, it commenced its work of construction on the disputed strip of land, and prosecuted the same at a cost of about $8,500.00, until sometime in June, 1903, when the trial court decided in this case that the Chesapeake and Ohio Company had paramount right of appropriation. Early in January, 1903, the Chesapeake and Ohio Company caused to be served upon the Deepwater Company, Trail and Cook, notices of its intention to apply to the circuit court of Raleigh county for the appointment of commissioners to ascertain compensation to them for the lands proposed to be taken, including parts of the Deepwater Company location and purchase. Upon the pleading and evidence adduced, the court decided as already stated that the applicant had prior right and was entitled to take the lands it sought to condemn on payment of just compensation, the parties having waived a trial by jury as to that question. Such proceedings were afterwards had that the compensation was fixed by a jury at $11,538.00, and the court overruled a motion by the defendant company to set aside the verdict. To the two judg-

ments aforesaid, the one of June 9, 1903, giving priority of right to the applicant, and the one awarding compensation, the Deepwater Company has obtained a writ of error.

The first question, whether the applicant has the superior right, as against the Deepwater Railway Company, to the location in question, is separate and distinct from the right claimed to take the lands in controversy for the purposes of its road. The determination of that question against the applicant would end the whole controversy, for, if the Deepwater Company's right to appropriate the land for the purposes of its road is prior and paramount to that of the Chesapeake and Ohio Company, the latter company cannot condemn the land at all and the matter of compensation does not enter into the case. As to what constitutes a location or priority of location between rival railroad companies, there has been no decision by this Court. Some observations on that subject were made in both of what may be termed the majority and minority opinions, delivered in the case of the *Kanawha &c. Co.* v. *Glen Jean &c. Co.*, 45 W. Va. 119, but the Court held that, before the plaintiff could enjoin the rival company, it must establish its right and title at law, and, on that ground, the injunction was dissolved and the bill dismissed. Point 2 of the syllabus holds that, "As between rival railroad companies priority of location gives priority of title which is perfected by after-condemnation"; but as to what amounts to priority of location the Court expressed no opinion. In the dissenting opinion it is suggested that priority of right is with the party who first begins condemnation proceedings for the land. Whether that position is sound arises in this case; for, if it be so, the Deepwater Railway Company, having acquired the land by a deed, in consequence of which no condemnation proceeding is necessary, would clearly have a better right to the location than the applicant. In the two opinions, nearly all the decisions of other states and of the Federal courts on this subject are cited, and, to some extent, analyzed and applied. Judge Brannon very properly suggested the necessity and propriety of examining those decisions in the light of the statutes under which the companies, contending for the disputed locations, endeavored to obtain them; for the courts rendering the decisions undoubtedly kept the judicial eye on the statutes governing the rights of

the parties.  All the powers vested in railroad companies to construct and operate their lines, enter upon lands and make surveys and acquire their rights of way, in the exercise of the power of eminent domain, are of statutory creation. Until recent years, such companies were not organized under general laws, and the privileges were conferred upon them by special acts of the legislature, designating their routes and empowering them to construct and operate roads, and some of the decisions referred to determine the question of right between railroad companies so chartered and organized. The rights and powers of the contending companies in this case have been acquired under general statutes governing all railroad companies of the state.

Both sides seem to rely upon the filing of maps and profiles in the office of the secretary of state and in the offices of the clerks of the county courts as an important, if not decisive, step in the acquisition of a location.  When it was apparent that there would be conflict over the location through Jenny's Gap, each company hastened the filing of its maps and profiles.  In view of this and of the suggestion that priority of right is with him who first institutes condemnation proceedings, section 65 of chapter 54 is quoted and attention to its terms invited.  It says:  "Every such corporation shall within a reasonable time *after its railroad is located,* cause to be made a map and profile thereof, with the names of the owners of the lands through which it runs, and of the noted places along the same stated thereon, and file the same in the office of the secretary of state, and in the office of the clerk of the county court of each county in which any part of said road is located."  By its very terms, the statute contemplates a location, an adopted location, of the railroad before the filing of the map and profile.  This being true, the filing of the map and profile cannot be considered an essential step in the progress of location nor a necessary act in the process of it. Such was undoubtedly the conclusion of this Court in *Wheeling &c Co.* v. *Camden &c. Co.*, 35 W. Va. 205, holding that the filing of a map and profile is not a condition precedent to the prosecution of condemnation proceedings.  Surely, a location must be made before the land can be taken, unless the taking is part of the act of location, and that it is not is now about to be determined.  Whether the filing of a map is

an evidential fact bearing on the question of diligence in following up and securing a right of location, or showing an intent to choose a certain location, is a separate and distinct question to be discussed later on.

As to the relation of condemnation proceedings to the subject of location of route, the statute, under the rules of interpretation and construction, must be viewed, read and applied in the light of what is known to be the universal practice in the location and construction of railroads. It would be a most violent presumption to say that the legislature intended to prescribe and enforce a rule of law, compelling a departure from the known practice. According to it, location is a mere matter of selection of the ground upon which the company desires to construct its road and is effected by action of the corporate authorities of the company, based upon what are known among railroad people, and especially railroad civil engineers, as preliminary, projected and actual surveys or locations, of which the first is a mere line with angles, marking the changes of direction, which forms a basis from which to work out on paper a diagram of the right of way, turning the angles into curves. This diagram is called the projected location and, from it, and by it, the right of way is staked out on the ground along the course of the preliminary survey, just as the boundaries of a tract of land are located on the ground by the deed calling for courses, distances and monuments. All this must be done before there can be any certainty as to the particular ground upon which the road is to be built. After it is done, and adopted by the board of directors, the location is made and is completed. What follows is not location, but construction. Of course, the word "location" has two meanings. It means either to place or set a thing or ones-self in a particular spot or position, or to designate the site or place of a thing. The former may include the latter perhaps, but the legislature certainly did not intend to use it in both senses. It would be absurd to say that the railroad should be actually placed, that is, constructed, in a certain place in order to be located. That is not the sense in which the term is used among railroad people, or among the people generally as applied to railroad building. The other sense and meaning is fully satisfied without acquisition of title to the land, or actual construction

of the road. By surveying and staking off of the right of way, adopted as aforesaid, the designation is complete and the acquisition of a title to the land and construction of the road thereon are clearly acts in the nature of execution of the purpose to place the road upon the ground designated and selected for it.

The character of our legislation authorizing the construction of railroads, in its early stages, with the modifications thereof down to the present time, perfecting it or formulating it into its present condition, tends strongly to support the views here taken. Prior to the Act of March 11, 1837, chapter 118, Acts of 1836-37, the rights and powers conferred upon every railroad company were found in the special act creating it. Upon some greater powers were conferred than upon others. There was lack of uniformity, each company possessing and exercising its own special powers. The Act of March 11, 1837, was passed for the purpose of establishing certain general regulations to apply to all railroad companies which might thereafter be chartered by the general assembly as effectually as if they were expressly re-enacted in the act creating the company, except so far as the act itself might otherwise expressly provide. It may well be assumed that these general regulations were such as, up to that time, had been usually inserted in the special acts granting charters to railroads. That act conferred upon railroad companies the right "to enter upon all lands and tenements through which they may desire to conduct their railroad, and lay out the same according to their pleasure,   *   *   * and if they think the interest of said company requires it, to take possession thereof for the purposes of the company," previously to the institution, and during the pendency, of proceedings for ascertaining the damages to the proprietor for the land taken for the use of the company. Section 9, chapter 118, Acts 1836-37 of Virginia. In such case, the president and directors were required to describe by certain limits the land which they desired to occupy and were given the right to purchase it or any part of it. In case of failure to agree with the owner, condemnation proceedings were authorized, but section 13 of that act further provided that, "In the meantime, no order shall be made and no injunction shall be awarded by any court or judge, to stay the proceed-

ings of the company in the prosecution of their works, unless it be manifest that they, their officers, agents or servants, are transcending the authority given them by this act, and that the interposition of the court is necessary to prevent injury that cannot be adequately compensated in damages." Under these provisions, entry upon, and laying off of, the land desired amounted to a complete appropriation of the same. That, without payment of compensation, evidently amounted to a location for it gave the company the right to take possession immediately, the right to purchase, the right to institute condemnation proceedings, and gave to the land owner also the right to have commissioners appointed and his compensation ascertained, in case of failure of the company for an unreasonable time to apply for the appointment of commissioners, and made the compensation a lien upon the land taken. The Code of 1849, chapter 56, section 4, provided that, "Any company incorporated for a work of internal improvement, may, by its officers, agents or servants, enter upon any lands for the purpose of examining the same and surveying and laying out such as may seem fit to any officer or agent authorized by it, provided no injury be done to the owner or possessor of the land. But no company shall, under the authority of this section, throw open any fences or enclosures on any land, or construct its works through the same, or in any way injure the property of the owner or possessor, without his consent." Other sections provided for condemnation proceedings in the event of failure to agree, and section 13 provided for entry upon the land and construction of the work thereon, on paying into court the sum ascertained by the commissioners, and then repeated the provisions of section 13 of the Act of March 11, 1837. Chapter 56 of the Code of 1860 contained substantially the same provisions. The language of section 4 of chapter 56 of the Code of 1849 is found in section 5 of chapter 52 of the present code, and there is added to so much of it as has been quoted, this clause, "Or until the same may have been legally appropriated to the use of the company, as provided by the laws of the state of West Virginia, relating to the condemnation and appropriation of private property for the use of companies incorporated for internal improvements." This section provides for entering upon lands for the purpose of examining

the same and surveying and laying out such as may seem fit to any officer, or agent authorized by it. This, as has been shown, under the act of March 11, 1837, amounted to an appropriation of the land. The powers conferred upon railroad companies by that act respecting appropriation for their purposes have been limited to the extent of preventing them from taking possession and constructing their work on the land until after the ascertainment and payment of compensation due to the owner. An examination of all the provisions leads irresistibly to the conclusion that the acquisition of title is not necessary to the.perfecting of a location.

This is the view taken by the courts of other states in which the statutes are in substance like ours. In Pennsylvania, there can be no entry upon the land before payment of, or security given for, compensation to the land owner, but, there as here, entry may be made for the purposes of examination and laying out of the location of the road. *Williamsport &c. R. R. Co.* v. *Philadelphia &c. R. R. Co.*, 141 Pa. St. 407; *Railway Co.* v. *Harvey*, 107 Pa. 319; *Gilmore* v. *Railway Co.*, 104 Pa. 275; *Dimmick* v. *Brodhead*, 75 Pa. 464; *McClinton* v. *Railway Co.*, 66 Pa. 404; *Levereing* v. *Railway Co.*, 8 W. & S. (Pa.) 459. As the relation of the railroad company to the land owner is the same in the two states, and there is no statute in either state expressly defining the rights of railroad companies contending for the same location as to each other, nor any statute requiring a map to be filed until after the location, the Pennsylvania statute not requiring any to be filed at all, their relations must be determined by the same principles and the same process of reasoning. The conclusion of the Pennsylvania court on the question as to whether condemnation, or the beginning of condemnation proceedings, is a part of the act of location, is exactly in accord with the one here given. In *Williamsport &c. Co.* v. *Philadelphia &c. Co.*, cited, the court holds: "In the taking of land for the construction of a railroad, the appropriation, as against the landowner, is valid and effective when compensation for the taking and the injury thereby is made or secured. But, as against a rival corporation, the act of locating a route for a railroad is the appropriation of the land covered by the line to the purposes of the construction and operation of the railroad, by virtue of the power of

eminent domain; and there can be no appropriation prior to the location of such line.'' The court then proceeds to define what is a location as between rival railroad companies and holds that a survey and staking out of the center line, when adopted by some corporate action, is such a location and appropriation. The act of location is clearly shown by the opinion in that case to be, in a proceeding between the railroad company and third persons, but an *ex parte* proceeding, an act on its part which shows that it has determined, elected, or signified its intention to build its road on a particular survey. Mr. Justice Williams says on the subject of the adoption of the line: ''This is done by the corporation, and it requires the action in some form of the board of directors. This makes what was before experimental and open, a fixed and definite location. It fastens a servitude upon the property affected thereby, and so takes from the owner and appropriates to the use of the corporation.'' He then shows that the owner's title is not divested, nor any right to enter upon the land conferred upon the railroad company, until after payment and proceeds as follows: ''As to third persons and rival corporations, however, the action of the company adopting a definite location is enough to give title.'' The choice of a location by laying it out by survey and the passage of a resolution by the board of directors, adopting it as the location on which the road will be built, is itself the exercise of delegated legislative power conferred upon the company. It is an exercise of the power of eminent domain to that extent. As to all persons except the land owner it is a complete appropriation. All that remains to be done is the extinguishment of his title by payment of compensation either under agreement with him as to the amount, or, upon ascertainment of it, in the manner prescribed by law. As to the land owner and all others, it fixes a sort of lien upon the property. In *Pittsburg &c. R. R. Co.* v. *Philadelphia &c. R. R. Co.*, 159 Pa. 331, the court defines a location as between rival corporations, claiming the right to the same land under the power of eminent domain, as follows: ''The requisites of a valid location of a railroad, as to third persons and rival corporations, are (1) a preliminary entry by engineers and surveyors who run and mark out lines, map them and report them to the company; and (2) the adoption of such a line by the board of directors.''

*Sioux City &c. R. R. Co.* v. *Chicago &c. R. R. Co.*, 27 Fed. Rep. 770, determines what a location is under the Iowa statute.  There no plat is required to be filed and payment of compensation must be made or secured before the railroad can be constructed upon the land selected.  Shiras, Judge, said in that case: "The company does not perfect its right to the use of the land, as against the owner thereof, until it has paid the damages, but, as against a railroad company, it may have a prior right, and better equity.  The right to the use of the right of way is a public, not a private right.  It is, in fact, a grant from the state, and although the payment of the damages to the owner is a necessary prerequisite, the state may define who shall have the prior right to pay the damages to the owner, and thereby acquire a perfected right to the easement."  It is true, that he adverts, in the course of his opinion, to the fact that condemnation proceedings had been commenced and says, "Whether such right may not, at least in some cases, antedate the time of the application to the sheriff, is open to question;" but he does not say his conclusion would have been different had no such application been made.  He decided the case upon the facts without laying down a general principle applicable alike to the case in hand and others presenting different states of facts.

In those states in which the statutes declare that a map of the location must be filed before the company acquires any right to take the land, the courts hold that, upon making the survey, adopting it and filing the map, the appropriation as to third persons is complete.  *Barre Railroad Co.* v. *Granite R. R. Co.*, 61 Vt. 1; *Rochester &c. Co.* v. *New York &c. Co.*, 17 N. E. 680.  In the latter of these cases, the court say: "When, therefore, a corporation has made and filed a map and survey of the line of route it intends to adopt for the construction of its road, and has given the required notice to all persons affected by such construction, and no change of route is made, as the result of any proceeding instituted by any land-owner or occupant, in our judgment, it has acquired the right to construct and operate a railroad upon such line exclusive in that respect as to all other railroad corporations, and free from the interference of any party.  By its proceedings it has impressed upon the lands a lien in favor of its right to construct, which ripens

into title through purchase or condemnation proceedings."
The statement, in that case says: "The plaintiff has not yet
purchased the right of way across Babcock's land, nor had
it instituted proceedings to condemn the same." The Ver-
mont case cited approves the New York case, adopts it and
applies its conclusions. In *Morris &c. Co.* v. *Blair*, 9 N.
J., Eq. 635, the two railroad companies were proceeding under
special acts of the legislature, conferring upon them, respec-
tively, the right to enter upon the land after determining
their routes and depositing surveys thereof in the office of
the secretary of state, and the court held as follows: "The
mere experimental surveying of a route will not confer any
vested or legal right until it shall have been adopted. By
adopting and filing a survey of their route, a company ac-
quires a right to obtain the lands over which it passed; and
they cannot be deprived of that right by another company
purchasing and taking deeds for those lands, even if made
without notice." In *Railway Co.* v. *Alling*, 99 U. S. 463,
the controversy arose under acts of Congress granting rights
of way, to be selected by the railroad companies through the
public domain, and no question of private ownership of the
land entered into it. Location took title as well as para-
mount right of way. The Denver Company had caused a
preliminary survey to be made through the Grand Canon of
the Arkansas River in 1871-72. The Canon City Company
caused a survey to be made in the same place in 1877. Noth-
ing further was done until the 19th day of April, 1878, when
the enginers of the Denver Company went back and occupied
the pass again. At four o'clock in the morning of the 20th
of April, the engineers of the rival company occupied the
same ground and later brought in a superior force and took
forcible possession of the ground, and the court held that the
Denver Company's preliminary survey made in 1871-72,
followed by its subsequent actual occupancy in 1878, gave it
the better right. Mr. Justice Harlan stated the conclusion
as follows: "Its surveys of 1871-72, followed by an occu-
pancy of the canon on the 19th of April, 1878, in advance of
the Canon City Company, for the purpose of constructing its
road through that defile, was, in our judgment, a final ap-
propriation of the way granted by Congress. The Denver
Company then, if not before, came into the enjoyment of

the present beneficial easement conferred by the act of June 8, 1872, and was entitled to have secured against all intruders whatever privileges or advantages belonged to that position.'' This conclusion seems to rest upon the adoption in 1878 of the survey made in 1871-72, for it does not appear that the Denver Company's engineers had time to make a new survey before they were driven away by the engineers of the other company.   In another part of the opinion, he says: ''Those who made the survey in 1877 undoubtedly knew when, by whom, and for what purpose those stakes had been there placed.   Nor had they sufficient reason to suppose that the Denver Company had finally abandoned its purpose of constructing a road through the canon.''

Having concluded that a survey adopted by corporate action as and for the location, constitutes appropriation as against third persons, the next inquiry is what kind of a survey, so adopted, is sufficient.  In *Railway Company* v. *Alling*, cited, Mr. Justice Harlan says the engineer described the survey of 1871-72, ''as a 'close preliminary;' that is, a line very near the location, without an actual location of the curves.''  He then says, ''But the location of the curves, he testifies, could have been made in his office away from the canon.  With that exception, he pronounces it to have been a complete survey.  The line thus surveyed was marked by stakes every hundred feet, numbered consecutively, and at points where it seemed necessary, a plus or stake between the hundred feet was added.  Of the work then done, a map and profile were made and returned to the chief engineer of the company, and estimates sent to its general manager. Upon the occasion of that survey, or shortly thereafter, employes of the company, under the direction of its engineer, removed several hundred yards of material, graded several hundred feet at the upper outlet of the canon, and put up a retaining wall ten to fifteen feet high, and about one hundred yards in length.''  It having been suggested that this, without further action, gave prior right of occupation, the court said: ''To this proposition we cannot yield our assent.'' It was necessary to actually occupy the pass with intent to build the entire line of road.  However, when the act of occupation with such intent, evidenced by all the circumstances shown, was added, the survey was held sufficient.  In *New*

*Brighton &c. R. R. Co.* v. *Pittsburg &c. R. R. Co.*, 105 Pa. 13, a preliminary survey, followed by actual possession of the ground, was declared sufficient. In *Pittsburg &c. Co.* v. *Pittsburg &c. R. R. Co.* 159 Pa. St. 331, the survey, held good, was only preliminary, for the court says of the work done by the engineer: "He marked the line on the ground by pins at irregular distances, indicating the center line of the railroad, the curves being run in and marked, but the cuts and fills not being indicated in any way, nor the width of the right of way to be appropriated." In *Morris &c. Co.* v. *Blair*, 9 N. J. Eq. 635, the court, · speaking of the survey held good, said: "In this connection may be mentioned another objection urged against the survey of the Warren Company, that it is uncertain and indefinite, being described by radii and curves, instead of a succession of angles of course and distance. Perhaps the former of these modes, if carefully done, is more accurate than the latter. Either would enable an engineer to run the survey on the ground and either mode therefore is sufficient." In that case, the court expressed the further opinion that an unplatted survey could be effectually adopted as a location and the plat made afterwards. Why not? Marking the location on the ground is certainly as much of a designation and identification of it as platting it on paper, and the field notes furnish the necessary data for preparation of the map.

A mixed question of survey and adoption, to be now considered, is, whether before the entire route is surveyed, a location of part of it can be made, the Deepwater Company, at the time of its alleged adoption on September 2, 1904, not having made even its preliminary survey between Jenny's Gap and Glen Jean, and this being the ground of a strongly urged objection to its claim of adoption on that day, as well as on later dates. For this position *Railway Co.* v. *Alling*, cited, is relied upon. There the court did say: "The grant was an entirety as to the right of way over all the lands lying on the route designated in the charter of the company, and it would be unreasonable to say that, as to a particular part of that route, a mere preliminary survey was in itself equivalent to a fixed location of the road and an appropriation of the way granted, while as to another part of the general route a similar survey would not be an appropriation of the way

granted, unless followed by actual occupation and use for railroad purposes. Any such construction of the statute must be held altogether inadmissible." But the statement of facts shows that the survey then extended through the canon and only four or five miles beyond it toward the west. While the court held that the surveys of 1871 and 1872 through the canon, unconnected at either end with any survey of the balance of the line, was not alone a sufficient location, it upheld the claim of the Denver Company to the location, not on the ground of a subsequent survey and location of the whole line, connecting with the fragment in the canon, but on the ground of diligence on the part of the company in prosecuting, in a general way, and at great expense, the enterprise it had undertaken, which included the ultimate construction of its road through the Grand Canon. Upon ascertaining that the company, in the short space of six years, had built its road from Denver to Pueblo; from Pueblo to Canon City; from Pueblo to Cucharas, a distance of fifty miles, from Cucharas to Garland, a distance of ten miles; and from Garland into the Rio Grande valley; and had ceased its work of construction only temporarily, owing to adverse general financial conditions in 1875 which rendered it difficult to obtain funds; the court held the claim of location through the canon good, although unconnected at either end with any survey of the balance of the line, and despite the facts that the road had not been located from the canon to either its eastern or western terminus, and that the survey through the canon was made prior to the passage of, and not under, the act of Congress which conferred upon the company its only shadow of legal right to use the canon at all for railroad purposes. The decision is a distinct and positive adjudication of the right of a railroad company to seize, adopt and hold a mere section, or fragment, of the right of way of its proposed line. In the opinion, attention is directed to the incalculable value of the Grand Canon to railway companies, as a gate or way of passage through the mountains, and, after showing diligent pursuit by the Denver Company, of the rights offered by the act of Congress, and to be acquired by construction of the proposed road, in the course of which this important pass has been occupied in good faith, in anticipation of its contemplated seizure by rival

companies, born and unborn, the court declared that, as to it, as a part of the entire grant, the company had come into the enjoyment of the beneficial easement conferred by the act of Congress, ''and was entitled to have secured against all intruders whatever *privileges or advantages belonged to that position.*'' *Railway Co.* v. *Alling* is the only case found thus far that seems to deal directly with the question propounded. General principles announced in other somewhat analagous cases, however, give support to the position here taken. In *Doughty* v. *Railroad Co.,* 21 N. J. L. (1 Zab.) 442, in which a railroad company, operating under a special charter, sought condemnation of a right of way over a certain tract of land, a defense was incompletenesss of location of the route. The special act provided that ''when the route or routes of such road, or lateral and branch roads, shall have been determined upon, and a survey of such route or routes deposited in the office of the secretary of state, then it shall be lawful for the company, &c., to enter upon,'' &c.; but the court held, (one judge dissenting,) that: ''The charter of The Somerville & Easton R. R. Co. does not require the location of the *whole route* to be filed, before application can be made to assess the value of lands on any part; it is sufficient if the location through such lands is filed.'' Afterward, the same land owner brought a suit in equity to enjoin the proceeding at law on the same ground, and the chancellor refused the injunction because the bill failed to show irreparable injury, but, in the opinion, he approved the views of the dissenting judge of the law court. *Doughty* v. *Railroad Co.,* 7 N. J. Eq. 51. His opinion, therefore, on the subject of sufficiency of location is mere *obiter.* Having no power to grant relief, he had no occasion to say whether a partial location could be made. A Kansas statute required every railway corporation, before constructing any part of its road into or through any county named in its charter, to file, in the clerk's office of the county court of the county, a map and profile of the route intended to be adopted by such company in such county, but the supreme court of the state held, in two cases that the filing of such map and profile was not a prerequisite to condemnation proceedings. *Hunt* v. *Smith,* 9 Kan. 137; *Railroad Co.* v. *Sheppard,* 9 Kan. 647.

The position here taken is not inconsistent with the principles of entirety in railroad construction.  It only recognizes, in connection with that idea and design, the physical fact of impossibility of complete location of an entire road by a single and instantaneous act, and gives to every railroad company the benefit of its enterprise, energy and outlay in partial execution of the work of location as long as it prosecutes in good faith the work it has undertaken.  The equity and justice of this principle is not only beyond successful contradiction, but is plainly countenanced by the spirit and terms of our legislation, which saves to every railroad company that has completed and put into operation any part of its road, within prescribed periods of limitation, the benefit of its work and its corporate powers and franchises as to the part so completed and operated, while losing by forfeiture all its rights and powers as to the part not completed.   Section 66, chapter 54 Code.   Whether the right to build and operate only a part of the road contemplated implies the right to locate only a part and stop need not be determined.  All we decide here is, that a company seizing certain land in the progress of its work of location, makes a location *pro tanto* which cannot be disturbed, while such company continues, in good faith and with due diligence, to prosecute the work it has undertaken.  A grant of the right to make a location of an entire line carries with it, by necessary implication, the right to do whatever is reasonably necessary to the effectuation of a location.   There must be a commencement of the work; it must progress to completion; the law is silent as to the place of commencement and as to what shall amount to completion of the work.  If no right can vest until the entire line is located, then a three hundred mile road having been surveyed and staked out from one terminus to within twenty miles of the other, may be defeated, by the location of a ten mile branch or new road through an indispensable defile before the remaining twenty miles of the long road can be located, and, in such case, thousands of dollars expended in surveying and construction on the located part would be lost.   How many times the location of a long line might have to be changed before completion to accommodate short ones and branches would depend upon the number of short roads and branches that could be projected along its

line. These continual interruptions would delay and obstruct final and complete location. When could it ever be said that a long line of road is located? What company could afford to expend money in construction until after having located its whole line? Can it be assumed that the legislature ever intended such results? Is it possible that the law makers ever suspected their liberal statutes, providing for railroad construction, would be loaded down by the courts with an interpretation imposing such uncertainty, inconvenience and hazard in the case of every attempt to operate under them? To the suggestion that this construction may, in some instances, prevent the construction of any road while seeking to make possible the building of two through a mountain pass, the reply is the lack of a satisfactory indication of such a possibility as well as inability to perceive it. In case of occupancy by one company of a defile, not wide enough to accomodate two roads, locations up to the defile on each side by another company would not necessarily result in a deadlock. Outside of the defile, there would be room for both, in consequence of which the company having prior occupancy of the defile could build its road. If, however, under peculiar conditions, such a deadlock should occur, it would necessitate legislative action or judicial consideration of elements entering into the question of priority of right, incident to, and growing out of, the peculiar situation and circumstances characterizing the controversy.

The principle enunciated in *Alling* v. *Railway Co.* seems to be not only equitably and legally sound but also accordant with the spirit of our legislation, as well as that of other states. It enables a railway company to take the benefit of its labor and expenditures and to hold, as the first taker, the land surveyed, if it desires to do so, until it shall have surveyed and located its entire line. Without this power, location of a long line would be a difficult feat to perform, if rival companies were disposed to obstruct the work by the location of short lines along the same route. Hence, it is an implied power accompanying the grant of the right to locate, necessary to the convenient and effectual performance of the things authorized by the grant. The seizure of a partial location, however, must be made in good faith and the test of its *bona fides* laid down in *Alling* v. *Railway Co.* is undoubtedly the

best the nature of the subject affords.  On the whole, the
principle is well adapted to conditions in this state and in
harmony with the liberal character of our railroad legislation.

As long as such a company prosecutes the main enterprise it
has undertaken with reasonable diligence, the right must be
accorded it to seize and hold any point on any part of its
intended route.  To deny this right would deprive it of a
most potent and essential means of advancing its work.  It
would, in every instance, give the short railroad an immense
advantage over the long one.  The ease and facility with
which an existing road may throw projected branches into
the mountain passes, in advance of the work of surveying a
long rival trunk line, and thus impede, delay and even pre-
vent, the prosecution of such great enterprises, so necessary
to the development of the natural resources of the state and
to the welfare of the people, makes the construction con-
tended for inconsistent with the spirit of our legislation on
the subject of railroads.  It is illiberal, technical and dis-
criminative, and, if admitted and applied, would discourage
and retard the work of providing cheap and adequate trans-
portation facilities for the people, opening our rich mines,
marketing the timber of our great forests and populating our
vast areas of unoccupied territory.  The court cannot defeat
legislative intent and state policy, and set its hand against
progress by adopting a construction so narrow and so palpa-
bly inimical to the public interests.  Therefore, we adhere
to the position announced by Judge Holt, in *Wheeling &c.
Ry. Co.* v. *Camden &c. Co..*, 35 W. Va. 205, and re-iterate
and apply, between rival companies, as well as between the
company and the land owner, the principle that partial loca-
tions of the route may be made and held as long as the com-
pany making them prosecutes its work in good faith and
with reasonable diligence.

Closely allied to this is the contention that a survey, made
before articles of incorporation are taken out, by persons
intending to incorporate for the purpose of building the
road for which the survey is so made, is a nullity and cannot
be adopted by the corporation, without having been retraced
and the stakes reset, after organization.  It is founded upon
the failure of the Deepwater Company to file a certificate of
extension before making its survey of the disputed location.

This rule was enunciated in *New Brighton &c. Co.* v. *Pittsburg &c. Co.*, 105 Pa. St. 13, but it is founded upon a pure technicality, destitute of the semblance of equity and incapable of working out any meritorious result. The substantial office of the survey is to supply information and descriptive matter without which a location cannot be made. It is not necessarily a part of the act of location. If the company has the data to enable it to accurately describe the location of its road, what boots it, whence it came or when procured, unless fraudulently or inequitably acquired? The case relied upon is contrary to the earlier case of *Morris &c. Co.* v. *Blair*, 9 N. J. Eq. 635, in which the opinion is expressed. that "It is of little importance whether the survey of the route was before or after the organization, or by whom or under whose direction it was made." Whatever doubt the argument of the question may leave is resolved in favor of the plaintiff in error, by a well settled rule of law to which the question may be referred by a close analogy. The unauthorized survey was, at its worst, an act in the nature of promotion. "The great weight of authority, however, recognizes the power and the right of a corporation when formed to adopt or ratify the pre-corporate contracts of its promoters. The more modern cases claim to see no difference between the corporation making a contract by adopting an agreement originally made in advance for it by promoters, and the making of an entirely new contract." 23 Am. & Eng. Ency. Law, 242. See also 10 Cyc. 1071. The Supreme Court of the United States so declares in *Whitney* v. *Wyman*, 101 U. S. 392. By causing these surveys at its own expense, the Deepwater Company was simply making preparation to do that which the statute gave it the right to do upon complying with certain regulations, formal and wholly *ex parte* in their nature, namely, the making of a certificate of extension and filing it in the office of the secretary of state.

This review of the authorities clearly establishes the following principles: First. When the statute does not make the filing of a map or plat of a railroad location a prerequisite to the adoption of it, an appropriation of it may be made without the filing of such maps. Second. The beginning of condemnation proceedings against the land owner is not a prerequisite to the acquisition of a right of way against third

persons and rival companies.   Third.   A mere survey made by the engineers of a railroad company, not adopted or determined upon by the corporation itself, through its board of directors or otherwise, as the location of the route, does not amount to an appropriation, giving priority of right as against third persons.   Fourth.   A survey staked out upon the ground as a center line, a preliminary line, or as an actual location, whether delineated on paper or not, if adopted by the corporation, as aforesaid, is a location within the meaning of the statute, and the company first making such location has a right to it superior to that of any other company. Fifth.   A survey made by promoters of a railroad corporation for its purposes before the company is organized, or by an existing corporation for an extension of its road, before filing in the office of the secretary of state a certificate of extension, may be adopted after incorporation or the filing of the certificate, as the case may be.   Sixth.   A location of a line, contemplated by original articles of incorporation, cannot be made before incorporation, nor can the location of a line contemplated by an extension be made before the certificate of extension has been filed as required by law. Seventh.   A railway company may begin the work of location on any part of its contemplated route, and a location of a part only of its road, may be held against a rival company, seeking the same location, as long as such locating company manifests good faith by the diligent proscution of the work contemplated by its organization.

The application of these principles to the facts must determine whether the applicant is entitled to the right of way through Jenny's Gap.   The work done in Jenny's Gap by the engineers of the Deepwater Company prior to September 2, 1902, although platted and shown by stakes on the ground, did not constitute a location.   The engineers alone could not make a legal location.   It could be made only by act of the board of directors.   For want of the consent of a majority of the stockholders and the filing of a certificate of extension, required by section 53 of chapter 54 of the Code, the board of directors were themselves powerless to make a location through Jenny's Gap.   If, however, the board of directors, after having obtained authority to do so, adopted, as the location of the road, the survey previously made, it

was immaterial, as has been determined, that the surveying
and platting had been done before the acquisition of such
authority. The stockholders met and passed the resolution
of extension early in the morning of September 2nd. Im-
mediately afterwards, the directors met and passed the reso-
lution hereinbefore quoted. Later in the same day the cer-
tificate of extension and a plat of the location through Jen-
ny's Gap were filed in the office of the secretary of state.
If the resolution passed by the board of directors was a res-
olution of location, or if, together with the resolution passed
by the stockholders, the circumstances under which both
were passed and the prior and subsequent acts of the board,
it amounted to a location, the undisputed fact remains that
the act of its passage preceded the filing of the certificate of
extension in the office of the secretary of state. This, it is
urged, constitutes an insuperable obstacle to its being treated
as an adoption of the location, however clearly the resolution
may have expressed the intent to so adopt, because the stat-
ute says "such corporation before commencing any such ex-
tension in this State, shall file in the office of the secretary of
state, a certificate" &c. But all these transactions occurred
on the same day and within the space of six or seven hours.
Can they not have effect according to the intent of the par-
ties performing them? As the stockholders had consented
to the extension, the directors knew the certificate would be
immediately filed. They had full authority to file it them-
selves, and intended to do so. They desired to file, at the
earliest possible moment, their map of the location through
Jenny's Gap. In order to make one trip to Charleston sub-
serve both purposes, they held their meeting and ordered the
filing of the map along with the certificate of extension. To
say they could not do this, but were bound to delay the act,
signifying adoption, until after the filing of the certificate,
would subordinate substance to mere form. Moreover, the
board, although having no power to delegate to its engineers
the selection of a location, could undoubtedly direct its en-
gineers to claim and hold a location, determined upon by
themselves. If, therefore, they did, on the 2nd day of Sep-
tember, 1902, order their agents to do certain acts with ref-
erence to the survey through Jenny's Gap, on that day and
afterwards, which clearly signified their intention to claim

and hold it as a location, the acts of the engineers, done in pursuance of such direction, were the acts of the board. These engineers did, on the 3rd day of September, 1902, file the projected map of that survey in the clerk's office of the county court of Raleigh County. On the 9th day of the same month, they filed in said office a map of their actual location through the gap, prepared in the meantime. On September 8th, they filed a second map of the same location in the office of the secretary of state. Whether these subsequent acts were ordered by the board depends upon the true interpretation of the resolutions passed on the 2nd day of September.

At the time of the passage by the stockholders of the resolution of extension they had before them plats of the surveys made up to that time, including the survey through Jenny's Gap, but it is contended that that resolution makes no reference to them. It does say, "said extension to be located on the most practicable route, as shown on the maps and profiles filed as required by law," but at that time none had been filed as required by law. They were filed on the same day, but after the adoption of the resolution. As has been shown, prior to that date, the engineers had made two surveys, one through Jenny's Gap and Clark's Gap, and the other over an entirely different route by way of Piney Creek and Camp Creek. Whether the Piney Creek and Camp Creek survey was ever platted is not shown. That it was, cannot be assumed. There is no evidence that any plat of it was made or placed before the stockholders or the directors. If, therefore, the resolution referred to maps then in existence, they were the maps of the Clark's Gap and Jenny's Gap survey. In view of these facts and the further fact that the stockholders' meeting was held for the express purpose, as shown by all the circumstances pertaining to the transaction and the situation of the parties, of claiming the Jenny's Gap location, as shown on the plat then in the hands of the stockholders and officers of the company, against the Chesapeake and Ohio Company, and, to that end, of making an immediate filing of those maps, and that the resolution passed by the stockholders and the one passed by the board of directors had been prepared on the day before with a view to adopting them early on the morning of the second of September and

of filing the certificate of extension and the maps as far as made, at the earliest possible moment after the passage of the resolution, can we say that those maps, together with such others of the same route as might thereafter be made, are the maps referred to in the resolution? The resolution says "to be located on the most practicable route as shown on maps and profiles filed," but it is urged that it must be read and applied as if it said "on the maps and profiles *hereafter* filed as required by law," or "on maps and profiles *to be* filed," &c. Being so read, to what does it refer? Part of the maps to be filed were undoubtedly those already made and in hand, and the hasty meeting of the stockholders was held for the express purpose of putting the company in position to file them. As to so much of the route as had been surveyed and delineated upon the maps they knew its location and intended to adopt it and endeavored to do so by this resolution. That is part of what is meant by the language, "said extension to be located on the most practicable route as shown on the maps and profiles, filed as required by law." So far as the survey had been made, the most practicable route had been ascertained and was then shown on the map. As to that part of it which had not been surveyed, the engineers were to proceed with their work and make the filings as fast as the maps could be prepared.

The two principal objections to this construction, based upon language found in the resolution itself, are, first, that it was designated by the stockholders themselves as their certificate of extension and not as a description of a specific location, and, second, that it directed certain persons by name "to make the necessary filings as required by law as fast as the same may be prepared." The direction to file the resolution as the certificate of extension would preclude its use, or an intent in passing it, for any other purpose inconsistent with the office of such certificate, but a location is perfectly consistent with an extension, and the resolution might well subserve both purposes. A fact fully proved is that the stockholders had before them at the meeting, and had previously examined, maps of the survey through Jenny's Gap, and of the survey of the route from the mouth of Barker's Creek to within four or five miles of Jenny's Gap, a distance of ten or twelve miles. Does the direction to make filings

"as fast as the same may be prepared" exclude these maps on the theory that they were filings already prepared and, therefore, not within the description? Such is the contention. It does not appear that they were then fully prepared. They had been prepared as maps, but, what was deemed a preparation thereof for filing does not appear, nor is it apparent from the record that any certificates had been attached to them. In the absence of evidence that they were fully prepared for filing, we cannot see that they are excluded by the descriptive terms quoted.

Here it is suggested that the adoption of this resolution by the stockholders did not make a location, because the statute says the corporate powers of a railroad corporation shall be in the board of directors. The point is well taken. This did not amount to a location, but it is an important transaction to be considered upon the inquiry as to whether the directors made a location. If the foregoing construction of the resolution is correct, it was adopted by the directors and made their resolution. Immediately after the adjournment of the stockholders' meeting and before any papers were sent away, the directors, fresh from the stockholders' meeting, fully cognizant of all that had been done there, and imbued with the spirit and purpose of that meeting, met and passed the resolution hereinbefore set out, directing the chief engineer and attorney in fact of the Deepwater Company, "to carry out the surveys and extensions of same as authorized by the stockholders in their meeting of this date and to do all things further that may be necessary for carrying out said resolution." If we are correct about the reference to maps and profiles in the resolution passed by the stockholders, they were the maps of the surveys mentioned in the resolution passed by the directors, and this resolution of the directors ordered the doing of all things necessary for carrying out the resolution, and among these was the extension of the railroad upon the location shown by the maps and profiles. This meeting was held at an early hour to insure the filing of the maps on that day, and they were sent away immediately for that purpose and actually filed by the person appointed for that purpose at that meeting. They, as well as the maps subsequently filed in the office of the clerk of the county court of Raleigh County on the 3rd and 9th days of Septem-

ber, 1902, and in the office of the secretary of state on the 8th day of September, 1902, were filed by order of the board of directors. For what purpose? Could it have been any other than to claim the location shown by them? Though not an indispensable step in the act of location, does not the act of filing maps by order of the board of directors clearly indicate their election and determination to take the location shown by the maps for the purposes of the road? They were the acts of the corporation. They were done under the resolution and to give notice of the location claimed by the company. That these acts were done with intent to make a present selection of the location in question is a necessary inference from their nature, the manner in which they were done, the surrounding circumstances and the contemporaneous and subsequent conduct of the corporate authorities. And several of them were subsequent to the date of the filing of the certificate of extension.

Is any rule violated by thus reading the resolutions in the light of the surrounding circumstances, the situation of the parties and their conduct? Certainly not. They are instruments of much less solemnity than deeds, wills and contracts, and all such instruments may be so read, when the intent of the parties is not made plain by the terms used. "The circumstances connected with the transaction and the situation of the parties may be considered in arriving at the intent of the parties." Devlin on Deeds, section 839, citing a long list of cases. The rule, as applied to contracts, is tersely and accurately stated in 9 Cyc. 587, as follows: "To determine the intention of the parties, if the meaning is not clear, it is necessary that regard shall be had to the nature of the instrument itself, the condition of the parties executing it, and the objects which they had in view, for which purpose parol evidence is admissible." In the law of wills the same rule obtains. "To aid in the true construction of the will, evidence may be received, and should be sought, of any facts known to the testator, which may reasonably be supposed to have influenced him in the disposition of his property, and all the surrounding circumstances at the time of making the will." *Magers* v. *Edwards*, 13 W. Va. 822. Another rule, applicable to contracts and deeds that are uncertain in their terms, is stated in 9 Cyc. 588, as follows: "Where the par-

ties to a contract have given it a particular construction, such construction will generally be adopted by the court in giving effect to its provisions. And the susequent acts of the parties, showing the construction they have put upon the agreement themselves, are to be looked to by the court, and in some cases may be controlling." See also *Kidwell* v. *Baltimore &c. Co.*, 11 Grat. 676; *Clark* v. *Nunn*, 25 Grat. 287; *Caperton* v. *Caperton*, 36 W. Va. 257; *Scraggs* v. *Hill*, 37 W. 706; *Shrewsbury* v. *Tufts*, 41 W. Va. 212.    Surely there must be equal latitude of inquiry in seeking the true meaning and application of a written declaration, made in an *ex parte* proceeding. Still another principle of wide application is that parol evidence is admissible to aid in making application of the descriptions in written instruments to the subject matter thereof. *Snooks* v. *Wingfield*, 52 W. Va. 441; Jones Real Prop. Conv. section 339; *Furbee* v. *Furbee*, 49 W. Va. 191, 195.

The suggestion that the resolutions are certain and definite in terms, founded upon the designation of the resolution as a certificate of extension, and the direction to make filings "as fast as they may be prepared," has been disposed of. The fact that they had maps before them and contemplated the making of others, makes the resolution uncertain as to whether the reference is to both classes of maps or to only one, and opens the way for parol evidence on the question of intent. Another objection to this method of interpretation is that the resolution, like a statute, must speak for itself and cannot be aided by extrinsic circumstances, and is not, therefore, to be classed with such instruments as deeds, wills and contracts. This position is clearly untenable. Though the power to make a location may be legislative in its nature, no form or mode by which its exercise shall be evidenced, has been provided by law. No reason is perceived why corporate action in the selection of a railroad location should be evidenced in a manner different from any other corporate act. The nature of the power and the mode of its exercise are obviously distinct. But if these were not so, statutes form no exception to the rules of interpretation and construction above referred to. In *Railway Co.* v. *Alling*, 99 U. S. 463, 474, Mr. Justice Harlan applied the principle, saying: "Of what the company had done, prior to the passage of the act

of 1872, towards effecting the objects of its incorporation, Congress, it is fairly to be presumed, was not uninformed. It was aware, we must also presume, of the routes designated in the charter of the company, for the main road and its several branches, all so connected as to constitute. when completed, an extended railway system for that entire region. That Congress was so informed is quite clearly indicated by the terms employed in the act of 1872. That act must, therefore, receive the same construction which would be adopted had it contained a full or detailed description of the routes of the main line and branches. In this view, and having due regard to all the circumstances and conditions of the company when the act was passed, we do not doubt that the intention of Congress was to grant to the company a present beneficial easement in the particular way over which the designated routes lay, capable, however, of enjoyment only when the way granted was actually located, and, in good faith, appropriated for the purposes contemplated by the charter of the company, and the act of Congress." Can the prior and subsequent conduct of the legislature be considered? Yes. All acts in *pari materia*, repealed or unrepealed, are to be considered. *Forqueran* v. *Donnally*, 7 W. Va. 114; *Vane* v. *Newcomb*, 132 U. S. 220; *Viterbo* v. *Friedlander*, 120 U. S. 707; *Simms* v. *Daniel*, 49 W. Va. 554. Can the surrounding circumstances be considered? Yes, and also the history of the times and purpose sought to be accomplished by the act. *Smith* v. *Townsend*, 148 U. S. 490; *Daniel* v. *Simms*, 49 W. Va. 554. If a hasty and precipitate meeting of the legislature had taken place by reason of some threatened peril to the commonwealth for the aversion of which a crude act had been passed, which, read in the light of all the circumstances clearly disclosed its purpose, I have no doubt that the manner in which the legislature had assembled and what was done and ordered before and at the session might be considered, along with all other attendant circumstances.

Nor, in reaching this conclusion by the application of the foregoing principles, have we lost sight of the status of the case in this Court. The plaintiff in error is regarded as a demurrant to evidence, admitting all the facts which the evidence of the defendant in error fairly tends to prove and all

fair inferences arising therefrom, and waiving all its own conflicting and impeached evidence and all inferences from its own evidence not necessarily arising therefrom. *Harrison* v. *Bank*, 6 W. Va. 1; *Nutter* v. *Sydenstricker*, 11 W. Va. 535; *State* v. *Seabright*, 15 W. Va. 590; *Abrahams* v. *Swann*, 18 W. Va. 274; *State* v. *Miller*, 26 W. Va. 106; *Laidley* v. *Smith*, 32 W. Va. 387; *State* v. *Denoon*, 34 W. Va. 139; *Mercantile Co.* v. *Truax*, 44 W. Va. 531; *Rohrbaugh* v. *Express Co.*, 50 W. Va. 148; *Miller* v. *Insurance Co.*, 8 W. Va. 515; *Ware* v. *Stephenson*, 10 Leigh 161; *Muhleman* v. *Ins. Co.*, 6 W. Va. 508. But the record here presents the three distinct issues of (1) a location by the Deepwater Company, before September 11, 1902, (2) a location by the Chesapeake and Ohio Company, September 11, 1902, and (3) a location by the Deepwater Company September 26, 1902. Settlement of the first in favor of the Deepwater Company is decisive of the case.   That only we are now considering, for the evidence relating to the others does not bear perceptibly upon it.   All the material evidence applicable to it was adduced by the demurrant, and whatever conflict there is in the evidence relating to this issue is found in the demurrant's own evidence.   Most, if not all, of the inconsistency in it has been eliminated by the determination of a purely legal question, the construction of the resolutions.   That never was a matter of inference to be left to a jury.   As to what was done in obedience to the resolution of the board of directors, there is no dispute, at least no question having any reasonable basis in the evidence.   Far more was done than a resolution of extension and a mere exploration of the route under it required.   Unless it be held that this evidence, on the whole, points certainly, unerringly and necessarily to a location by corporate authority before the 11th day of September, 1902, much of it must be taken for naught and put out of the case, and the court has no right to discard it.

The Deepwater Company made a location by another and later act of adoption.   The directors of that company, on the 26th day of September, 1902, passed a resolution reciting that the engineer had located the company's proposed railroad from Glen Jean up the Dunloup Creek to the mouth of Sugar Creek and up Sugar Creek, crossing the divide, to

Pack's Branch of Paint Creek, down that branch, and up Paint Creek, crossing the divide, to Miller's Camp Branch of the Marsh Fork of Coal River, down that branch to the junction of the same with Surveyor's Fork, up that fork to Jenny's Gap and through that Gap to the waters of Slab Fork, and then on to the Bluestone River as hereinbefore described; approving and adopting the whole of that location and such maps of it as had then been filed in the office of the secretary of state and in the clerks' offices of the county courts of Fayette, Raleigh, Wyoming and Mercer Counties; and directing the engineer in charge to file as speedily as practicable in the proper offices maps and profiles of the remaining parts of said location. Prior to that time, the map and profile of the location through Jenny's Gap had been filed. This was a formal, specific and deliberate adoption of that location by the corporate authorities of the Deepwater Railway Company. This is undisputed, except that it was not an adoption of a location of the entire line according to complete surveys then made. That objection has been disposed of.

If, prior to the 26th day of September, 1902, the Chesapeake and Ohio Company had not, by corporate action, adopted the same location through Jenny's Gap, the right of the Deepwater Company to that location, by force of the action of its directors on September 26, 1902, is beyond dispute. The defendant in error claims to have adopted the location on the 11th day of September, by a resolution passed by its board of directors at a meeting held on that day in the city of New York. For proof of this, it introduced, over the objection of plaintiff in error, what purports to be a record of the minutes of such meeting, including the adoption of such a resolution. This record is in the form of typewritten sheets, pasted in a regular book of the company kept at Richmond, Virginia, by the secretary of the company, who testified that he had not attended the meeting and knew nothing of it or what had been done thereat, other than what was disclosed by the typewritten matter. This typewritten record on sheets of paper, signed by the president of the company and the assistant secretary, had been received by him and pasted in a minute book, but he did not even say when they had been received. Neither the president, assistant sec-

retary nor any other person, who appears to have attended the meeting was called to testify that such meeting was held and such resolution passed, and nothing was shown by way of excuse for not calling them. Furthermore, it was admitted that both the president and assistant secretary were living, and residing, respectively, in Richmond and Philadelphia.

The defendant in error attempts to use this record as evidence to prove its own acts in its own favor against a total stranger to it. It is not used for the purpose of establishing any contractual relation between it and the plantiff in error. It makes no charge against the plaintiff in error. It does, however, make use of this resolution to prove title in itself to a thing which the plaintiff in error says it has not acquired and to which the plaintiff in error is entitled, unless, by prior acquisition, it has become the property of the defendant in error. In support of the admissibility of the record for this purpose, upon showing that it was entered in the book by one having authority to do so, it is contended that the records of a private corporation are admissible evidence against all persons to prove its corporate acts.

The able counsel for defendant in error say the following is deducible from the authorities as a rule on the subject: "The records of a corporation are admissible to establish a right in it which grows out of its own proceedings, although they may not be admissible to fasten the liability on others." In testing the soundness of this proposition, it is necessary to bear in mind that the decisions relating to the admissibility of such evidence present many distinctions, in respect to the subject matter of the controversy, the relation of the parties to it and to one another and the nature of the fact sought to be proved by such evidence.

That the records of a corporation are always admissible against it is perfectly apparent. They are admissions and declarations against its interest and may be used as such, just as the books, memoranda, letters and declarations of an individual may be used against him, although not admissible in his favor. Jones Ev. section 530; *Townsend* v. *Church,* 6 Cush. 279. The cases illustrating this use of corporation records and books can have no possible bearing on the question presented here. Hence, no time need be spent in collecting and analyzing them.

When the controversy is between stockholders, concerning their interests in the corporation and involves the consideration of the acts of the corporation as effecting directly its status and indirectly their interests, the records and books are admissible, if authenticated by showing that they are the records and books of the corporation and have been regularly kept as such. This is done by calling as a witness the secretary or other recording officer, if he can be had. This rule rests upon considerations of convenience and also upon sound legal principle. By becoming a stockholder in a corporation, a person creates, between himself and all other stockholders of the corporation, and between himself and the corporation, a contractual relation which is affected and controlled, in some degree, by every proper act of the corporation, whether done by its board of directors, its officers or its mere employes. He is bound by its past acts and has consented to be bound by all its future acts. If they result in gains, he shares in them, and, if in losses, he suffers his proportionate part thereof. The business of the corporation is his business. Though in a direct and primary sense, the directors and officers are the agents of the corporation, and not subject to his individual control, they are, in a substantial way, his agents and employes and he, along with the corporation, is privy to their acts and may be deemed to have authorized every book entry and every record of corporate meetings and acts that the officers and agents may lawfully make. He is deemed to have known, when he established his relationship of stockholder, that such records and entries would be made and that they would indirectly relate to, and affect, his interest. Having access to the books and constructive knowledge of their contents, there is ground for a presumption that he would not have suffered an improper entry to remain in them without objection. Moreover, a relationship closely allied to that of partnership exists between the stockholders of a corporation. Because of the relation of agency existing between co-partners and the right of inspection of the books relating to the partnership business and affairs, the books of a co-partnership are admissible evidence in controversies between the members thereof. ''Although the book of an individual is not evidence in his favor against others, yet, from the very nature of the case, the books of a partnership must be evi-

dence between the partners themselves. Their situation is one of confidence. They agree to unite; and, as to others, to become one person; and the books of the firm are to speak their language and record their joint transactions; and there is an understanding that these books are to be appealed to, to tell their true situation. To admit them as evidence, then, is only effectuating their agreement, and using their own criterion and test, to ascertain the truth. Such books, therefore, kept subject to the inspection of each, must be admitted as correct till the contrary is shown.'' Mills, Judge, in *Simms* v. *Kirtley*, 1 Mon. 80. This doctrine has been enunciated and applied in early Virginia cases, binding upon this Court. *Fletcher* v. *Pollard*, 2 H. & M. 544; *Brickhouse* v. *Hunter*, 4 H. & M. 363. See also *Heartt* v. *Corning*, 3 Paige (N. Y.) 566.

Though, according to good authority, there is no legal principle upon which the action can be justified, courts almost everywhere hold that the records and proceedings of a corporation are admissible to prove *prima facie*, against an individual, his membership in it as a stockholder. This rule is stated in *Turnbull* v. *Payson*, 95 U. S. 418, as follows: "A person is presumed to be the owner of stock when his name appears upon the books of the company as a stockholder; and, when he is sued as such, the burden of disproving that presumption is cast upon him.'' It was adopted by this Court in *Railway* v. *Applegate*, 21 W. Va. 172, without any reference to other authorities for a verification of its soundness. The federal decision just mentioned predicated the rule upon the following decisions as authority therefor: *Coffin* v. *Collins*, 17 Me. 440; *Merrill* v. *Walker*, 24 Me. 237; *Plank Road* v. *Rice*, 7 Barb. (N. Y.) 162; *Hoagland* v. *Bell*, 36 Barb. (N. Y.) 57; *Turnpike Road* v. *Van Ness*, 2 Cranch (2 C. C.) 451; *Mudgett* v. *Horrell*, 33 Cal. 25. The oldest of these is *Coffin* v. *Collins*, an action of replevin against a sheriff for certain logs seized under an execution against a certain corporation. The defendant endeavored to prove that the property which he took out of the possession of the plaintiffs belonged to a certain individual who was a member of the corporation, in consequence of which said individual's property was liable to be taken under the execution. In order to establish the existence of the corporation, he intro-

duced the act incorporating it and then offered to prove by oral testimony the organization of the company and user of the corporate franchises conferred by the act, and the court held this evidence inadmissible to prove the fact of corporate existence on the ground that the records were the best evidence and not to be supplanted by oral testimony without having shown that they could not be obtained.  Just here it is to be observed that the case was not an action by the corporation against a stockholder, but the issue was whether or not the relation of stockholder existed.  In the next case, *Plank Road Co.* v. *Rice*, there was neither a declaration of such a rule nor any necessity for it.  The subscription paper of the defendant was produced and there was oral proof of his acceptance of a certificate of stock in the corporation without objection.  He did not deny his connection with the corporation nor the acts which it was alleged he had done by way of subscription and participation, but did deny the legal sufficiency of those acts to make him a stockholder.  *Hoagland* v. *Bell* lays down the rule as declared in *Turnbull* v. *Payson*, but without the citation of a single authority to support it and without any reference to any legal principle as a basis for it.  The opinion is about a dozen lines in length. *Merrill* v. *Walker* has no relation whatever to a corporation or the stockholders thereof.  The citation of it is a manifest error.  Presumably the case intended to be referred to is *Whitman* v. *Granite Church*, 24 Me. 236, on the opposite page of the same book from *Merrill* v. *Walker*.  That was an action against a corporation by an individual, a stranger, for money had and received, and the records were not offered in its favor, but against it as its admission of the indebtedness to him, and not in reference to any relation as stockholder.  Hence, it is wholly inapplicable.  *Mudgett* v. *Horrell* expressly decides that the stock book of a corporation is not admissible against one who is alleged to be a stockholder for the purpose of proving that he is a stockholder.  Commenting upon this rule, Morawetz on Corporations, section 76, says: "While the rule stated in the preceding section appears to be well established by authority, it is difficult to support it by any principle of the common law.  The stockbooks of a corporation are undoubtedly evidence against it, as admissions; but they cannot be admitted on this ground

for the company, against a person who denies that he is a shareholder." In this, the author is supported by *Wheeler* v. *Walker*, 45 N. H. 355, and *Chase* v. *Railroad Co.*, 38 Ill. 215. Though denouncing the rule as indefensible in principle, the Alabama court enforced it in *Semple* v. *Glenn*, 91 Ala. 245.

A review of the cases will show that, except in a few instances, there was evidence other than the mere appearance of the defendant's name upon the stock book to show his connection with the company as a stockholder. In *Railway Co.* v. *Applegate*, 21 W. Va. 172, the defendants were shown, by the oral testimony of two witnesses, to have been connected with the company as subscribers. Witnesses testified to having been present at the meetings, the records of the transactions of which were shown by the books. It was proved by one witness that the defendants had paid to him for the company part of their subscriptions. Others had seen the signatures of the defendants on the subscription list. What this Court meant, therefore, seems to have been, not that the appearance of the defendant's name on the stock book was alone sufficient to make him a subscriber *prima facie*, but that his subscription having been shown, as well as the presence of his name on the stock book, the burden was upon him to prove a release. So in the *Glenn Cases*, 91 Ala. 245, 6 S. E. 806, 96 N. C. 413, the subscriptions do not seem to have been contested, but it was claimed that the defendants had been released by a change in the name of the corporation and in the amount of its capital stock. As that corporation had been insolvent and inactive for about twenty years when the suits were brought against the stockholders, the admission of its books, record and papers might have been justified on the ground of necessity, owing to the death or absence of those who made the entries in them, although that is not stated as the reason for admitting them. In *Semple* v. *Glenn*, 91 Ala. 245, there was not even an authentication of the books, but the court said, in view of the absence of any objection to their introduction, "we must assume that this ground of objection was waived." The issue in that case was not whether certain things had been done, but the legal effect of what admittedly had been done. In *Brewer* v. *Stone*, 11 Gray (Mass.) 228, the subscription

of the defendant was admitted and the admission of the books to prove his' connection with the corporation, by way of subscription to its stock, was unnecessary, and they were only admitted for the purpose of showing acceptance, by the corporation of which the defendant was admittedly a member, of a conveyance to it. The identity and legal effect of acts done were the only issues in the case and that they had been done was uncontroverted. *Railroad Co.* v. *Eakins*, 30 Ia. 279, did not involve any controversy as to whether there had been a subscription, the fact of signing the subscription was admitted and the technical objection set up was that the subscription paper had not been properly stamped nor the stamps properly cancelled. The other issues were that certain conditions on which the subscription had been made had not been complied with. These were conditions subsequent. The subscriber had connected himself with the corporation and the question was whether he had been released by failure to perform conditions, subsequent to his subscription, but precedent to the right to require payment of the amount subscribed. In the similar case of *Railway Co.* v. *Dunn*, 39 Me. 587, there was no controversy about the fact of the original subscription. The subscription papers, signed by the defendant, were put in evidence, and he resisted payment on the ground that he had been released by failure, on the part of the company, to obtain a subscription to its capital stock in a certain amount and to comply with other conditions. In *Grays* v. *Turnpike Co.*, 4 Rand. 578, the original subscription book was produced and one defendant admitted his signature, while that of the other was proved by a competent witness. Judge Carr said there was "abundant evidence to prove the defendants subscribers." *Railroad Co.* v. *White*, 41 Me. 512; *Railroad Co.* v. *Sherman*, 8 R. I. 564; *Vawter* v. *Franklin College*, 53 Ind. 88; *Stewart* v. *Railway Co.*, 32 Grat. 146, and *Turnpike Co.* v. *McKean*, 10 Johns. 153, all belong to the class of cases just examined. Very few, if any, of these cases, may be regarded as having enunciated the proposition that, in the absence of proof of a subscription or other substantial connection of the defendant with the corporation, so as to make him a participant in the enterprise, the presence of his name alone on the books of the company, written there by one of its agents, is *prima*

*facie* proof of membership.  If, however, such doctrine is established, it affords no reason for extending the departure to any other class of cases.  It has been denounced as unsound in principle by both courts and textwriters.

A very numerous class of cases in which corporations have been permitted to introduce their records and books for the purpose of proving their acts is, that in which it is necessary to establish only *de facto* corporate existence and not existence *de jure*.  For instance, a bank sues on a note, or a railroad company on a contract, and the plea of *nul tiel record* is interposed, denying that the plaintiff is a corporation. Here proof of corporate existence is required, but it need not be full nor need the evidence be such as is necessary to prove many kinds of specific corporate acts.   Many decisions say that for this purpose, it suffices to introduce the charter, act of incorporation, or articles of incorporation, and then proof that the plaintiff has acted as such corporation, carried on a banking business or a railroad business.   The issue is collateral in its nature.   The plea simply requires the plaintiff to establish a status—show that it is what it claims to be.   In that question, the other party has no direct, but only an incidental, interest.   The fact thus put in issue is distinct from, and practically independent of, the real controversy between the parties.   See *Way* v. *Billings*, 2 Mich. 397; *Insurance Co.* v. *Allis*, 24 Minn. 75; *Henderson* v. *Bank*, 14 Miss. 314; *Bank* v. *Harrison*, 39 Mo. 433; *Insurance Co.* v. *Cadwell*, 3 Wend. 296; *Jones* v. *Dana*, 24 Barb. 395; *M. E. U. Church* v. *Picket*, 23 Barb. 436; *Bank* v. *Bank*, 21 N. Y. 542; *State* v. *Murphy*, 17 R. I. 698; *Turnpike* v. *Cutler*, 6 Vt. 323; *Bank* v. *Allen*, 11 Vt. 302; *Bank* v. *Lee*, 112 Mass. 521; *Bank* v. *Glendon*, 120 Mass. 97; *Mix* v. *Bank*, 91 Ill. 20.   Some of the earlier cases required a great deal more proof than the courts now exact.   To this class belong the following cases, relied upon by counsel for defendant in error, as authority for the position they have taken here: *Wood* v. *Bank*, 9 Cow. (N. Y.) 193, an action against an endorser on a note; *McFarland* v. *Ins. Co.*, 4 Denio (N. Y.) 392, an action by the insurance company on a bond conditioned for the payment of money; *Grant* v. *Coal Co.*, 80 Pa, St. 208, an action of *assumpsit* by a coal company on an account for coal sold to defendant; *Duke* v. *Navigation Co.*,

10 Ala. 82, 44 Am. Dec. 472, an action by a corporation having the right to collect tolls on a navigable river, against an individual for tolls alleged to be due from him. In none of these cases did the question of corporate existence enter into the real merits of the issue. But, be this as it may, the cases do not support the position assumed. In *Wood* v. *Bank,* no objection was made to the introduction of the records. The contention was that, granting the truth of all they contained, the things shown to have been done did not amount to a compliance with the requirements of law. In *McFarland* v. *Ins. Co.,* the court said: "The books of the corporation, in connection with other evidence, were properly received for the purpose of showing how the company was organized; and that it acted under the charter." In *Grant* v. *Coal Co.,* the secretary of the plaintiff company produced the minute book and testified to all the acts shown by the book and said that he had been the original secretary of the company and that the minutes were in his hand writing. He was subjected to a rigid cross-examination as to what had been done under the articles of incorporation. In *Duke* v. *Navigation Co.,* two witnesses testified to the acts of organization and the records were admitted in connection with their testimony. The clear import of these four cases is that the corporate records were used to prove what the things were which it was shown by oral evidence had been done. It appeared from the latter kind of evidence that meetings had been held and transactions reduced to writing and then the writings themselves were used as the best evidence of the identity, nature and character of what had been done.

Practically all the cases found in which it has been held that the books and records of private corporations are evidence of their acts and proceedings, as against strangers, belong to this last class. This accounts for the oft repeated proposition that, for such purposes, such records are admissible in controversies with strangers to the corporation. To say that the same rule must be applied to the determination of a question of vital interest between the corporation and a stranger; would ignore the distinction which ought to be made between the cases in which the issue is one in which the stranger has no direct and substantial interest and the case in which the records are offered to prove the very fact

which is directly in controversy between them. A corporation may be permitted to appeal to its records to establish a collateral issue without permitting it to introduce self-made and self-serving entries upon its books to prove that which is directly in issue between it and a stranger. That they cannot do so to prove title and claims against strangers has been decided in a number of cases. *Jones* v. *University*, 46 Ala. 626; *Railroad Co.* v. *Cunnington*, 39 O. St. 327; *Railroad Co.* v. *Noel*, 77 Ind. 110; *Coosaw Mining Co.* v. *Mining Co.*, 75 Fed. Rep. 860; *London* v. *Lynn*, 1 H. Bl. 205, 214. A case offered as one establishing the contrary is *Blake* v. *Griswold*, 103 N. Y. 429. It was an action by a creditor of a corporation against its trustee, to recover his claim from him on the ground of an alleged false statement in an annual report signed by the defendant as such trustee, on the faith of which credit had been extended. The defendant had been connected with a second corporation as trustee or director, between which and the first certain transaction had taken place and the records of the two corporations clearly disclosed the falsehood of the statement which the defendant had signed. The defendant made such admissions in his answer and also in his testimony as showed his actual knowledge of the conditions, disclosed by the corporate books, and misrepresented by him. Whether he had had such knowledge was the vital issue. It was in connection with these admissions that the records were admitted. Moreover, as he was a stockholder and director in the corporations, the records were in a sense his own acts. Hence, the case fails to sustain the proposition asserted. *People* v. *Bank*, 1 Doug. (Mich.) 282, was an information in the nature of a *quo warranto* to forfeit the charter of a bank and the principal issue was whether or not the corporators had paid in the necessary amount of capital within the time limited by the act of incorporation. The records were admitted without objection, and relied upon by both parties as evidence. It was contended by the attorney general that this money, although paid in, was shown by entries in the books to have been immediately withdrawn, Hence, the question was, not the admissibility of the records, but whether or not, upon a fair construction of the entries, they showed that there had been only a pretense of contribution

of the capital required.  *Barcello* v. *Hapgood*, 24 S. E. 124.
is relied upon.    It was a suit brought for the purpose of
rescinding a contract for the sale of land on the ground of
defect of title.    A number of objections were made to the
title, some of which grew out of the fact that it had passed
through the hands of a foreign corporation.   It was objected
that such a corporation could not acquire, and dispose of,
real estate, and that a deed made by an agent, acting under
a resolution recorded in the minutes of the corporation, could
not make a good conveyance of the property.    Here, the
controversy was not between the corporation and a
stranger, but between persons who were strangers to the
corporation.   The resolution and the deed made under it
were not self-serving, but self-disserving as to the corpora-
tion.  *North River Co.* v. *Church*, 53 Am. Dec., 2 Zabb.
424, an action to recover assessments upon the defendant's
land, is also relied upon.    The admission of the books con-
taining the assessment and the minutes of the company was
objected to, but the court said the act of incorporation had
expressly declared that the assessment should be admissible
evidence.   The minutes of the corporation were also admit-
ted on the authority of *Owens* v. *Speed*, 5 Wheat. 420, and
*Wood* v. *Bank*, 9 Cow. 194.   The defendant seems to have
been a stranger to the corporation, but the matters to prove
which the minutes were introduced, must have been collateral
in their nature.   *Schell* v. *Bank*, 14 Minn. 43, goes further,
holding an entry on the books of a corporation, authenticated
by proof by the secretary of the character of the book and
the fact that it had been kept by him, to be admissible
against a stranger, in connection with oral evidence showing
that certain acts had been done in pursuance of the resolution
constituting the entry.    It is to be noticed, however, that
the objection to the entry was based on immateriality and
irrelevancy and not on insufficiency of the evidence offered
to show that the resolution had been adopted.    The court
said that a general objection to the introduction of the evi-
dence was not good, if the matter offered in evidence was
competent for any purpose.    The resolution was clearly com-
petent to show what sort of a resolution it was.    Another case
not cited, but yielding some support to the proposition contend-
ed for, is *Rayburn* v. *Elrod*, 43 Ala. 700, holding, in an action

of ejectment, that a record of the minutes of a quarterly conference of the M. E. Church, South, was admissible to prove who were the trustees of a church building, within the circuit of the conference. The court, in passing upon the admissibility of this evidence, referred to no principle justifying its admission. It simply said: "From the minutes, it appeared that the plaintiffs had been, at a time prior to the trial, elected trustees. This was the best evidence that could have been given of their being such. No higher or more conclusive evidence existed. If the defendant knew of any better he should have suggested it." *Owing* v. *Speed*, 5 Wheat. 420, is relied upon, but that was a case in which the records of a public corporation were held admissible. It affords no precedent for the admission of records of private corporations. All authorities admit this distinction, Jones on Ev., section 526; Wigm. Ev., section 1661.

Even the records of public corporations are not admissible to prove anything but acts of a public nature. Thus, in *Attorney General* v. *Warwicke*, 4 Russell 222, it was said: "Private entries in the books of a corporation, which are under their own control, and to which none but the members of the corporation have access, cannot be made use of to establish rights of the corporation against third parties." So in *Marriage* v. *Lawrence*, 3 B. & A. 142, the court held that: "An entry in the public books of a corporation, is not evidence for them, unless it be an entry of a public nature."

Counsel for defendant in error base their contention largely upon an observation made in *Railroad Co.* v. *Eastman*, 34 N. H. 137, quoted in 2 Thomp. Corp., section 1921. But as no question, calling for such principle, arose in that case, the declaration is *obiter*. Mr. Thompson also says, in Volume 6 of his Work on Corporations, section 7740, that "The general rule is believed to be that, except for the purpose of proving *what the corporation did*, or what action its corporators took in *effecting the organization*, its books and records are not evidence as against a stranger." Then, in the same section, he states the converse of the proposition as follows: "They are evidence, in any form of proceeding and against any party, for the purpose of showing that the corporation

passed the vote recited, adopted the resolution recorded, or enacted the by-laws spread out upon its minutes,—whenever, under the frame of the issues, it becomes material or relevant to show that fact, and always subject to contradiction, by proving that the record is a false one." In a subsequent portion of the same section, he says: "But where it is sought to use the records of a private corporation, as evidence of the facts which they recite, for the purpose of *concluding*, or even *influencing* the rights of third parties who are strangers to the record, then such records are not admissible, on the same principle which operates to exclude the records of legal judgments when offered for a similar purpose, on the principle that they are *res inter alios acta.*" His conclusion reads as follows: "The sound rule, then, is that the records of a private corporation cannot be used in evidence for the purpose of sustaining a claim of the corporation against persons who are not members of it, or to defeat a claim of such a person against the corporation, or to affect strangers any way." There is, at least, an apparent contradiction in the language quoted, but this may be due to mere inaccuracy of expression. If it be shown by competent evidence that a resolution was passed, that a meeting was held, that an organization was effected, then the record made of the resolution, the by-law, or the organization would undoubtedly be at least admissible evidence to show what by-law was passed, what resolution was adopted and the character of the organization affected; but this is a very different matter from admitting these records to show *that* they were made. Proof of the creation of a thing differs widely from proof of the identity or character of a thing after it has been made. One of the authorities cited by Mr. Thompson in support of his text, section 7736, referred to in section 7740, is *Rider* v. *Railroad Co.*, 13 Ill. 516. From an examination of the report of that case it will appear that the action was *assumpsit* to recover from a subscriber assessments on the stock which he had bound himself to take. He did not deny the subscription but claimed to have been released. Being *prima facie* a stockholder, mere authentication of the books made them admissible. Then the question was the identity and legal character of what had been done. The case is no authority for the position that such records are admissible under the

circumstances of this case.    Another case is *Semple* v. *Glenn*, 91 Ala. 245, in which one question was, whether the character of the corporation, to the stock of which the defendant had subscribed, had been changed, in the alteration of its name and increase of its capital, so as to release him.    The records of the two corporations were compared for the purpose of determing this question.    In the opinion it is said: "It does not appear from the record that the identification or correctness of the copies, or that the minutes were made by any person authorized to make them, was shown.    But as no objection on this ground seems to have been made in the trial court, nor made here, we must assume that this ground of objection was waived."    As there had been no objection to their introduction as evidence, it was impliedly admitted that the transactions embodied in the records introduced had taken place and the issue was made, not on the question of their admissibility, but on the question of the identity of the corporation as the one to the stock of which subscription had been made.    The question determined from these records was not whether certain things had been done, but the character of what admittedly had been done.    This is evidently what the court meant in *Coffiin* v. *Collins*, 17 Me. 440, and also what is meant in Clarke on Corp., section 650, by the declaration that the minutes of a corporate meeting are the best evidence within the rule excluding secondary evidence without an excuse therefor having been shown.    The latest, and, perhaps, the most analytical work on the subject of evidence, states the proposition in this language: "The records of the proceedings and acts of an ordinary private corporation are, according to one theory, the constitutive acts of the corporation; they are not the evidence of what is done, but they *are* what is done; since the proceedings must be in writing." Wigmore on Ev., Vol. 3, section 1661.    The author cites no cases illustrating what he means, but his view seems to be the idea above expressed.    If so, expression in another form would be that they are not evidence that a thing was done, but are the evidence of the identity of the thing done, it being granted or proved that something was done, because whatever was done was put in writing and the writing itself is the evidence of it.    Proceeding, he says, "According to the other theory, they are merely entries of the oral doings,

and are thus analogous to any ordinary person's contemporary entries of his doings." This makes them mere memoranda to be considered as a part of the oral testimony of the clerk or officer who entered them, testifying as a witness that the things purporting to have been done were done. That this is the true interpretation of his language appears from the following: "The general practical difference between the two theories is as to their effect on the conclusiveness of the entries." Under the first theory, the written memorial of what was done could not be varied by parol evidence; under the second, it could. This shows that he does not mean to say the record is proof that it was made at the time, in the manner and by the authority recited therein. Further proof of this is found in a subsequent paragraph of the same section in which he says, "Books of entries of corporate proceedings are (as above quoted) ordinarily not receivable under the Regular Entries Exception without calling the clerk or other entrant. But the records of a public officer are admissible under the present Exception without calling the entrant, because he is a public officer; and therefore the books of a public corporation (that is, with us, usually a municipal governing body) are receivable *without calling the official entrant.*"

Another light in which to view the text quoted from Thomp. Cor. and found in Elliott Ev., section 416, Whart. Ev., section 662, and An. & Ames. Cor. 573, is the difficulty of conceiving circumstances under which corporate existence can be directly and vitally in issue between the corporation and a stranger. No stranger, save the state, has any direct interest in that question. From the vast number of cases in which such records have been introduced to prove a mere *de facto* existence against strangers the expression used by the text writers and relied upon here has arisen. Generally speaking, they are evidence against strangers to prove the doings and proceedings, necessary to show itself to be a corporation, for generally the stranger's interest in that question is but slight. As against him, mere user of the franchise claimed is about all that need be shown. So understood, this part of the text may be reconciled with the other part which says corporation books cannot at common law be used to sustain a claim of the corporation against persons not

members of the corporation, or defeat a claim of such persons against the corporation, or in any way to affect strangers. Whart. Ev. 662; Thomp. Cor., sections 1921. 7740; *Railroad Co.* v. *Eastman*, 34 N. H. 124. The establishment of the existence of a corporation affects no right of a stranger to it. It neither adds to, nor takes from, his possessions.

The effort here is to prove title, not by purchase, recovery or otherwise, from the adverse party, but to show title, nevertheless. It is title by appropriation from the public. Shall it be proved by evidence, different in character from what is required in other cases? Could title by purchase, in case of conflict between two corporations, be established by the exhibition of a resolution on the books of one of them, on the theory that, as to the other, it was a corporate act and not a transaction with such other company? What is the difference between the two cases? A prior purchase by one company precludes title by purchase in the other. Here appropriation by one company at a certain time precludes title by appropriation in the other. If a self-serving, self-made, unsworn record can avail in the one case, there is not a shadow of reason why it should not in the other. This long and laborious search and analysis of the authorities has revealed but two or three cases which seem to countenance such use of corporate records. Against them stand several, holding the contrary. Therefore, the weight of authority, reason and sound legal principles all assert the contrary. Escape from this conclusion is attempted on the theory that adoption of a route is an act in the process of organizing or constituting the corporation. The fallacy of this lies in the fact that a railroad corporation may be fully organized without having acquired a specific location or right of way for its road. Organization precedes location. Location is an act of acquisition and not of organization or constitution. It is an an act of preparation for building the road, just as is the purchase of a right of way and materials.

As this evidence must be discarded as inadmissible, nothing remains to support the claim of a location by the defendant in error on the 11th day of September, 1902. It is said that the certificate of the secretary of state, showing the filing of the plat of the right of way claimed in his office on that day

is evidence. This plat was filed by an engineer of the company. His authority to do so is not shown, even by his testimony or in any other way, and the certificate of the secretary of state is not evidence or proof that this plat was filed by authority of the company. It may be evidence of the filing of the certificate, but it is no evidence of the authority of the person by whom it was filed to make such filing. The statute merely authorizes the use of certified copies from his office as evidence in lieu of original papers. It does not say his certificate may have any other probative effect.

We are asked to reconsider, and recede from, the decision in *Lambert* v. *N. & W. Ry. Co.*, 54 W. Va. 387, construing the certificate of extension of the plaintiff in error and holding it sufficent. Having reconsidered it, we see no reason for changing the conclusion of the Court in respect to the validity of the certificate. We think the objective point on the Virginia line is indicated with reasonable certainty and nothing more is required. The preposition "to" has primary and pregnant significations, of which the former is adopted here, while in *Railway Co.* v. *Railway Co.*, 112 Ill. 580, the latter was adopted.

Failure of the plaintiff in error to allege in terms that the land in controversy is in its actual use and necessary to the proper exercise of its franchise is relied upon as ground for the appropriation thereof by the defendant in error, notwithstanding priority of location by its adversary. The answer avers that the lands in controversy form a portion of its right of way and are part of the land on which it has located its right of way. A right of way, land upon which to build the road, is an absolute necessity of a railroad company. Is it possible - that lands so used, or held for the purpose of such use, and not exceeding, in quantity, the amount necessary for such purpose, are not to be regarded as necessary for the purposes of the company? We do not understand counsel to assert the negative of this proposition, but only to say the necessity must be alleged in terms. This was not the defect in the pleas rejected in *B. & O. R. R. Co.* v. *P. W. & Ky. R. R. Co.*, 17 W. Va. 812. They fail to show that the land was in use by the defendant company. "Pleas numbers two and three did not so much as aver that the lands were in present use." Judge Johnson

in said case. Plea number four, held good, merely averred that the land was in use by the defendant in its business. To this a replication to the effect that the use of the land by the defendant was not in good faith but only for the purpose of preventing the applicant from taking it was filed. Nothing is perceived in the case relied upon that requires a formal averment that the land is necessary to the exercise of the defendant's franchise, in addition to the averment that it is in use by the company, which shows how it is used. It is enough that the plea shows that it is devoted in good faith to a proper use in the exercise of the franchise.

Thus it appears that priority of right to the location in question is in the plaintiff in error, which renders it unnecessary to pass upon the rulings of the court in the proceedings for ascertaining the damages. Nothing remains but to reverse the judgments and dismiss the action. But the final contention is that the action ought not to be dismissed for two reasons, the first of which is that the defendant in error ought to be permitted to prove the passage of the resolution of September 11, 1902, by competent evidence. Some authorities are presented which say that, under certain circumstances, a case reversed by an appellate court, after having been tried by the court below without a jury, should be remanded for a new trial. But none have been shown which hold such action proper when the court can see that no beneficial result could be attained by such action. As the Deepwater Company clearly has the prior and superior right to the location in question, regardless of any action that may have been taken by the Chesapeake and Ohio Company on the 11th day of September, 1902, proof of a location by that company on that day would avail nothing. Hence, a new trial for letting in evidence on that question would be futile and idle.

The other ground of objection is the assertion that the defendant in error may have entered upon the lands in question since the date of the judgment in the court below and commenced the construction of its road thereon. In fact, affidavits have been presented here showing that such is the fact, and it is earnestly insisted that the action should not, under any circumstances, be dismissed, and that it should be remanded for inquiry as to any rights that may have vested, pending the litigation in this Court. The decision in *Rail-*

*way Co.* v. *Alling*, 99 U. S. 463, is relied upon as an authority to sustain this position. We think this is a misapprehension of the meaning and effect of that decision. It was not in a condemnation proceeding. It was the final disposition of two chancery causes, instituted, respectively, by the two litigating companies against each other. In such proceedings, there is full latitude and ample process to work out the equities of the parties. This is a proceeding at law in which only legal rights are cognizable and in which the door cannot be opened to all the equities of the parties. Another important distinction is that the Court, in *Railway Co.* v. *Alling* was controlled and governed by a statute applicable to the peculiar situation in which the Court found the two litigating companies. The canon was too narrow for two roads and the statute provided that, in such case, the railroad company having prior right to the location through the pass should not prevent any other railroad company from the use and occupancy of such canon, pass or defile for the purposes of its road, in common with the road first located, and that the expenses should be equitably divided between any number of railroad companies occupying and using the same canon, pass or defile. Accordingly, the Supreme Court on reversing the decree of the circuit court, remanded the causes with the following directions: "By proper orders, entered in each suit, the court below will recognize the prior right of that company to occupy and use the Grand Canon for the purpose of constructing its road therein, and will enjoin the Canon City and San Juan Railway Company, its officers, agents, servants, and employes, from interfering with or obstructing that company in such occupancy, use, and construction. It may be that, during the pendency of these causes in the court below, or since the rendition of the decrees appealed from, the Canon City and San Juan Railway Company has, under the authority of the circuit court, constructed its road-bed and track in the Grand Canon, or in some portion thereof. In that event, the cost thus incurred in those portions of the canon which admit of only one road-bed and track for railroad purposes may be ascertained and provided for in such manner and upon such terms and conditions as the equities of the parties may require." All this was based directly upon the statu-

tory provision, as will appear from an examination of the opinion.

Plaintiff in error having requested this Court to enter an order directing a restoration to it of the possession of the premises in controversy and granting it leave to sue out a writ of possession therefor, the defendant in error resists on the ground that improvements may have been made on said premises by it, pending proceedings in the court below and in this Court, since it obtained possession thereof under its writ of possession, for which compensation should be ascertained and made a lien on the property before it is deprived of its possession, as is provided in chapter 91 of the Code. Unless this case can be distinguished from others decided by this Court, involving claims for improvements, the ground of resistance is untenable for two reasons. The first is that the defendant in error is not a defendant within the meaning of the statute It gives compensation under certain circumstances, to "any defendant against whom a judgment or decree shall be rendered for land." The Chesapeake and Ohio Company's position here is that of plaintiff, it having instituted this action to take from its opponent the land in question. Though, for some purposes, some courts have said a writ of error to reverse a judgment is a new suit, it cannot be regarded as a new and separate action within the meaning of said statute or the law relating to improvements. *Hall* v. *Hall*, 30 W. Va. 779, 785, is authority for this position. That was a bill of review to reverse a decree of sale, a proceeding to correct error, bearing a greater resemblance to a new suit than does a writ of error, or an appeal in the same case. JUDGE SNYDER said: "The present suit is a continuation of that suit," meaning *Lowther* v. *Hall*, in which the erroneous decree had been made. The second reason is graver than the first. Under the decisions of this Court, the defendant in error cannot possibly be a *bona fide* occupant, although it entered upon the land under an order of the court, believing its title to be good, because it had notice not only of all the facts, being ignorant of matter of law only, but also of the adverse claim of the plaintiff in error. The propriety of the application of the maxim, *Ignorantia legis neminem excusat*, to occupants who, relying upon muniments of title, which none save lawyers and courts would con-

demn as defective, make improvements · under an honest belief in the validity of their titles, was questioned by JUDGE DENT in *Bodkin* v. *Arnold*, 48 W. Va. 108, but he admitted that such application of it had become the settled law of this State.   Point two of the syllabus in that case declares the law to be that "The defendant is not entitled to offset his improvements against the rent, if at the time they were made he had knowledge of the plaintiff's title, although he in good faith believed his own title to be the better, in point of law."   JUDGE BRANNON so interpreted our earlier decisions in *Williamson* v. *Jones*, 43 W. Va. 562, saying:    "If Jones, by mistake of law, was led to believe that the court sale conferred good title, that will not serve him."   And this statement was made in the discussion of Jones' claim for improvements.   To the same effect see *Hall* v. *Hall*, 30 W. Va. 779; *Dawson* v *Grow*, 29 W. Va. 333; *Cain* v. *Cox*, 23 W. Va. 613.   One who is not a *bona fide* occupant may recover for improvements made under such circumstances as would make it a fraud upon his rights to allow the owner to take them without compensation.   *Hall* v. *Hall*, 30 W. Va. 785; *Dawson* v. *Grow*, 29 W. Va. 333; *Morris* v. *Ferrell*, 2 Rand, 6.   But in order to enable him to do so, the owner must have stood by and suffered the work to go on, with knowledge of it, or, by some inequitable conduct, have induced the occupant to make improvements, or have been guilty of *laches* in asserting his claim.   Any such ground of recovery is precluded by the facts apparent on the face of this record.   The defendant in error took possession and presumably began work on the property while the litigation was in progress, and its right to do so was being resisted most strenuously and, possibly by every means the law afforded.

It has been suggested that a right to such compensation may be predicated on the provisions of section 20 of chapter 42, authorizing an entry upon the land by the applicant, upon his paying into court the amount of compensation reported by the commissioners, and then providing that "No order shall be made, or any injunction awarded, by a court or a judge, to stay him in so doing, unless it be manifest that the applicant is insolvent, or that he, or his officers, agents or servants are transcending their authority, or that such ·inter-

position is necessary to prevent injury which cannot be adequately compensated in damages." This only legalizes an entry before final judgment, and confers the right to use and improve the land pending further proceedings. It does not vest title in the applicant. Chapter 42, section 22. If he makes improvements at such stage, he makes them on the land of another, and, after final judgment, he is in no better situation than a successful plaintiff in ejectment would be, pending a writ of error to reverse. As the proceeding is purely statutory, it was necessary for the legislature to provide specially for the acquisition of possession and title. Shall the Court add further plausible, but unnecessary, reasons for the existence of these statutory provisions. We know of no rule or principle of construction which either requires or permits it. Reading into such a statute by mere unnecessary implication a right of such importance as that of compensation for improvements, would require some legal principle, as well as considerations of the most weighty character, to justify it. In practically all condemnation proceedings, the applicant has a certainty of ultimate acquisition of title and the only matter to be determined is the amount of compensation. In such cases, the question of compensation for improvements could hardly arise. It is this class that these statutory provisions seem to contemplate. We have here the exceptional case in which the title cannot be obtained, because the land is already devoted to a public use, and the consequences of an erroneous decision of that question have given birth to the question now presented. In such case, proceedings might be stayed under exceptions provided for in the statute, namely, when the applicant is transcending his authority, or such interposition is necessary to prevent injury which cannot be adequately compensated in damages. We do not so decide, but this view seems plausible as well as accordant with law. Land already devoted to a public use and the use of which is necessary to the enjoyment of the franchise of the internal improvement company owning it cannot be condemned. Code, chapter 52, section 7; *B. & O. R. R. Co.* v. *P. W. & Ky. Ry. Co.*, 17 W. Va. 812. A court may be prohibited from proceeding in an action to condemn property that cannot be taken. *McConiha* v. *Guthrie*, 21 W. Va. 134. Why may not its orders be superseded or

otherwise properly stayed in such case?   Do the statutory provisions, authorizing entry before judgment, properly construed, apply to such case as this?  If not, its status is the same as that of any other action to recover land.

Some authority for the position that restitution lies in the discretion of the court  and  is not demandable of right,  has been produced, but none to the effect that a court should arbitrarily refuse it and without a substantial reason. Like specific performance and rescission  of  contracts, it may be discretionary, but it will go as a matter of course, when a proper case is made. *Brown* v. *Cunningham*, 23 W. Va. 109; *Mc-Cormick* v. *Short*, 49 W. Va. 1; *Keck* v. *Allender*, 42 W. Va. 420; *Stannard* v. *Brownlow*, 1 Munf. 229; *Branch* v. *Burnley*, 1 Call. 147; *Haebler* v. *Myers*, 132 N. Y. 366.

The conclusions above stated require  reversal of the  two judgments complained of, setting aside of  the verdict, restitution of the land  in  controversy to the  plaintiff  in error, and remanding of  the case to  the  circuit court of Raleigh county, with leave to the plaintiff in error  to  sue out a writ of possession for said premises, and a direction to dismiss the action as to the lands of the plaintiff in error with costs to it, after it shall have been restored to the possession  thereof as aforesaid, all of which will be adjudged and ordered.

· *Reversed.*

Brannon, President, (*dissenting in part*):

I cannot concur in that feature of the foregoing opinion or syllabus laying down, as a permanent rule of  evidence,  that the record of proceedings of the directors of a railroad company is not admissible evidence alone to prove that the directors adopted a particular location for its road.   It is an act which can be done alone by the directors.   It cannot be done except in regular meeting.   The act of adoption is a  resolution in its record books.   It may not be going too far to say that is the only evidence, if the record be in existence.   It is not necessary to say that; but I do say that the resolution on record is competent evidence.   It cannot create a debt or liability against a stranger; it cannot operate to take away his right; but where the law demands that the corporation do any act by its directory, that book is competent evidence to prove the doing of that act.   Our Code says in chapter 53, section

52: "They shall keep a record, which shall be verified by the signature of the president." That "record" must have force to prove an act demanded of the directors by law. The authorities cited by Judge Poffenbarger, properly construed, show this. Wigmore, Ev., says: "No one doubted that the records of a meeting were receivable to prove the doings of a meeting." That is just the case—to prove the adoption of a resolution. In this case, as Wigmore says, this record is, in fact, not simply evidence of the act, but the very "*act itself.*" 2 Wigmore, Ev., section 1074 (3). I think the law is well phrased in *Signa* v. *Brown*, 171 N. Y. 496. "The books of corporations for many purposes are evidence, not only between the corporation and its members, and between its members, but also as between the corporation or its members and strangers. They are received in evidence generally to prove corporate acts of a corporation, such as its incorporation, its list of stockholders, its by-laws, the formal proceedings of its board of directors." Thompson, Corp., section 7740, will sustain this view. It is not claimed that such a record is conclusive, but admissible evidence. Thompson says: "The general rule is believed to be that, except for the purpose of proving *what the corporation did*, or what action its corporators took *in effecting its organization*, its books and records are not evidence against strangers." As the location had to be adopted by the directors, under this authority the record is competent to prove *what the board did*.